ADAMS, Appellant, vs. CITY OF MILWAUKEE and another, Respondents.

*November 19, 1910—January 10, 1911.*

*Municipal corporations: Police power: Ordinances regulating sale of milk: Tuberculin test: Classification: Milk produced in and out of city: Destruction of property: Recovery by owner: Evidence: Scientific books.*

1. Where there are conflicting scientific beliefs or theories concerning the danger of infection from the use of milk from cows afflicted with tuberculosis and concerning the efficacy of the tuberculin test for the purpose of determining the presence of tuberculosis in cows, the common council of a city authorized by statute to legislate for the protection of the public health may determine upon which of these theories it will base its police regulations, and unless such determination is clearly and manifestly wrong the courts will not interfere with the ordinance on the ground that the scientific theory upon which it is based is incorrect or unsound.

2. Statutes and decisions and evidence referred to go to show a widespread popular recognition of the danger of infection from bovine tuberculosis and of the efficacy of the tuberculin test.

3. Classification for the purpose of valid police regulation may be based upon differences in the opportunity or facility for inspection inherent in the different classes, although danger of infection from each in case of actual contact might be equal.

4. An ordinance which prescribes different police regulations relative to the sale and distribution of milk shipped into the city from those regulations relative to milk produced from cows within the city, is valid.

5. In order to uphold an ordinance which requires for its enforcement destruction of property, a case must be presented in which the usual sanction of fine or imprisonment or the abatement of nuisance by suit in court, or indeed any milder or slower mode of dealing with the offender than destruction of his property, would be inadequate to preserve public health or safety.

6. In all ordinary cases of destruction of property under such authority the property owner may resort to the courts and recover his damages by proving that the property which was destroyed as a nuisance or as dangerous to the public health or safety was not such in fact.

7. Where large quantities of milk are daily shipped into a city by persons residing outside of the jurisdiction of the city officers, the liability of the milk to rapid decomposition, the futility of proceeding by fine and imprisonment against the shipper, carrier, or consignee, and the necessity for effectually preventing any of such milk being used, all establish a situation in which it may be said that the common council had the right to decide that destruction of the milk was the only available or efficient penalty for the enforcement of the ordinance.

8. There is a distinction relative to the power to destroy property in the abatement of existing nuisances and in the abatement of nuisances created by wilfully placing property in the forbidden place or condition after the enactment of an ordinance and in defiance of it. Self-inflicted damage is not recoverable. The open judicial inquiry in such case is, Was the damage self-inflicted?

9. On the trial of a cause before the court without a jury it is not error to receive in evidence scientific books and reports of scientific bodies for the purpose of informing the court. Such books and reports so offered in evidence have only the weight and value of like books and reports read by the court without having been offered in evidence.

APPEAL from a judgment of the circuit court for Milwaukee county: W. J. TURNER, Circuit Judge. *Affirmed.*

For the appellant there was a brief by *Ryan, Merton & Newbury,* and oral argument by *T. E. Ryan* and *M. A. Jacobson.* They cited, besides other cases, art. XIV, Amendm. Const. of U. S.; secs. 1, 13, art. I, Const. of Wis.; *State ex rel. Adams v. Burdge,* 95 Wis. 390, 70 N. W. 347; *Potts v. Breen,* 167 Ill. 67, 47 N. E. 81; *State v. Redmon,* 134 Wis. 89, 114 N. W. 137; *State ex rel. Kellogg v. Currens,* 111 Wis. 431, 87 N. W. 561; *State v. Whitcom,* 122 Wis. 110, 99 N. W. 468; *Bittenhaus v. Johnston,* 92 Wis. 588, 66 N. W. 805; *Lowe v. Conroy,* 120 Wis. 151, 97 N. W. 942; *State v. Elofson,* 86 Minn. 103, 90 N. W. 309; *State v. Nelson,* 66 Minn. 166, 68 N. W. 1066; *St. Paul v. Peck,* 78 Minn. 497, 81 N. W. 389; *Bonnett v. Vallier,* 136 Wis. 193, 116 N. W. 885.

For the respondents there was a brief by *Daniel W. Hoan,* city attorney, and *John J. Cook,* assistant city attorney, and

oral argument by *Mr. Cook.* They relied upon the same cases; also, *State ex rel. Milwaukee Med. Coll. v. Chiltenden,* 127 Wis. 468, 107 N. W. 500; *Jacobson v. Massachusetts,* 197 U. S. 11, 25 Sup. Ct. 358; *Sanders v. Comm.* 117 Ky. 1, 1 L. R. A. N. s. 932; *State v. Layton,* 160 Mo. 474, 61 S. W. 171; *Nelson v. Minneapolis* (Minn.) 127 N. W. 445; *New Orleans v. Charouleau,* 121 La. 890, 46 South. 911, 18 L. R. A. N. s. 368; *Black v. State,* 113 Wis. 205, 89 N. W. 522; *Servonitz v. State,* 133 Wis. 231, 113 N. W. 277.

TIMLIN, J. Plaintiff, a farmer residing in Waukesha county and owning a number of cows and engaged in shipping milk from said cows to the city of *Milwaukee* to dealers in that city, brings this suit in his own behalf and in behalf of other producers and dealers in milk similarly situated and engaged, against the city of *Milwaukee* and its commissioner of health to enjoin the enforcement of an ordinance, the material provisions of which are as follows:

"No person shall bring into the city of *Milwaukee* for sale, either by wagon, cart, train, or any other kind of vehicle, or keep, have or offer for sale or sell in said city, any milk or cream drawn from cows outside of said city, contained in cans, bottles or packages, unless such cans, bottles or other packages containing such milk or cream for sale, shall be marked with a legible stamp, tag or impression bearing the name of the owner of such cow from which such milk was drawn, giving his place of business, including the name of city, street and number, or other proper address, and unless the owner or owners of such cows shall, within one year from the passage of this ordinance, file in the office of the commissioner of health a certificate of a duly licensed veterinary surgeon, or of any other person given authority by the State Livestock Sanitary Board to make tuberculin tests, stating that such cows have been tested with tuberculin and found free from tuberculosis or other contagious diseases. . . . Such certificate shall be good for one year from date of its issuance, . . . must be renewed annually, . . . shall show in each case that the animals from which such milk was drawn are free from tuberculosis or

other contagious diseases.    All milk and cream from sick and diseased cows, . . . or which does not conform to all other provisions of this chapter, shall, upon discovery thereof, be confiscated, forfeited and immediately destroyed by or under the direction of the commissioner of health, bacteriologist, or officer detailed, who shall, if done in good faith, be held harmless in damage therefor."

Considerable difference of opinion appears to exist among those having a reputation for learning with respect to the efficacy of the tuberculin test for ascertaining the presence of tuberculosis in cattle.    This test is made by an hypodermic injection of a toxic product of the tubercle bacilli, which causes a described and recognized rise of temperature in the animal afflicted with tuberculosis, but has no effect, or a different effect, upon cattle not so afflicted.    It seems to be agreed, at least in this case, that the bovine type of tubercle bacillus is in form and otherwise distinguishable from the human type by miscroscopic examination.    It is claimed by some that the bovine type of tuberculosis is not ordinarily communicable to the human system, in the absence of abrasion, through the alimentary canal.    There is also a lack of evidence to establish that tuberculosis of the human lungs, or consumption as it is commonly called, in its ordinary form is caused by the bovine type of bacillus.    Nevertheless the prevention of this common and usually fatal disease is by some of the experts put forward as a ground of support for the ordinance in question.    There is evidence, and also findings, to the effect that tuberculosis generally is a disease caused by micro-organisms known as tubercle bacilli; that there is a mammalian type of these bacteria subdivided into bovine and human bacilli, and that human beings are susceptible to infection from the bovine tubercle bacilli by ingestion, inhalation, or inoculation.    This bovine tuberculosis is communicable to the human being through the medium of milk or its products taken as food.    Bovine tuberculosis prevails among cattle in the country adjacent to *Milwaukee*.    The tuberculin

test, while not infallible, is the only reliable and useful means for testing cattle for tuberculosis. It is, however, not necessary to support the ordinance in question to show that human pulmonary tuberculosis is caused by drinking the milk of cows afflicted with bovine tuberculosis. If the milk of such cows produces disease of any kind, or is harmful to health, this is a sufficient basis for police regulation of its sale and distribution in the city. There is much evidence to the effect that the use of such milk as a beverage does cause in the human being, especially in infants, bovine tuberculosis, and one of the learned witnesses goes so far as to suggest that the bovine type of tubercle bacillus may or will by successive cultures or transplanting change into the human type. On the whole there is evidence to support the findings of the learned circuit court that the use of milk from such diseased cows is inimical to health. Counsel for respondents call our attention to ch. 542, Laws of 1909, and to the following statutes of other states, recognizing the efficiency of this tuberculin test: Indiana, ch. 181, Laws of 1909; Delaware, ch. 122, Laws of 1909; Maine, ch. 133, Laws of 1909; Maryland, ch. 466, Laws of 1910; Michigan, ch. 172, Laws of 1909; Minnesota, ch. 392, Laws of 1909; New York, pp. 27–29, vol. 1, Consolidated Laws of 1909; North Dakota, ch. 160, Laws of 1909; Oregon, ch. 213, Laws of 1909; South Carolina, ch. 131, Laws of 1909; South Dakota, ch. 291, Laws of 1909; Tennessee, ch. 475, Laws of 1909; Vermont, ch. 163, Laws of 1908; Virginia, ch. 335, Laws of 1910. We are also referred to the cases of *State v. Nelson,* 66 Minn. 166, 68 N. W. 1066, 34 L. R. A. 318; *Nelson v. Minneapolis* (Minn.) 127 N. W. 445; and *New Orleans v. Charouleau,* 121 La. 890, 46 South. 911, 18 L. R. A. N. s. 368.

The evidence and findings in the instant case, this legislation, and these decisions, go to show a widespread recognition of the danger of infection from bovine tuberculosis and of the efficacy of the tuberculin test. When there are conflicting

scientific beliefs or theories in such matters it is for the city council to determine upon which theory it will base its police regulations, and unless it is clearly and manifestly wrong it is not for the courts to interfere on the ground that the scientific theory on which the ordinance is based is incorrect or unsound. *Jacobson v. Massachusetts,* 197 U. S. 11, 25 Sup. Ct. 358; *Sanders v. Comm.* 117 Ky. 1, 1 L. R. A. n. s. 932; *State v. Layton,* 160 Mo. 474, 61 S. W. 171, 62 L. R. A. 163. We also consider the enactment of such ordinances, generally speaking, within the power of the common council of the city of *Milwaukee* under sec. 3 and subds. 9, 23, and 40 thereof, in ch. 4 of the city charter.

It is next contended that this ordinance is void as contrary to the constitution of the United States and of this state, in that it is partial and unequal in its operation. It applies to dealers in milk drawn from cows outside of the city of *Milwaukee,* while dealers in milk drawn from cows within the city are not included in the terms of the ordinance or subject to its requirements. It is not denied that reasonable classification may be resorted to, but it is argued that this is not reasonable classification. If we should consider only the danger to health or the liability to communicate tuberculosis from the bovine to the human animal this position would be unanswerable. But when we consider these two classes of milk dealers from the viewpoint of facility for inspection and regulation, important differences are at once perceptible. The city officials intrusted with the preservation of the public health cannot visit or exercise authority on the farms lying outside of the city limits and in other counties. Milk so brought into the city is a mixture, the product of many different cows mixed in the same can or other receptacle. The bacillus of bovine tuberculosis is a micro-organism invisible to the naked eye, and its presence in milk is difficult of detection by microscopic examination. With the required high-power miscroscope a very small quantity of the milk will exceed in area the entire

miscroscopic field and in that there may not be a single bacillus, while if we were to take up the contents of the can or other receptable drop by drop with such microscope there might be discovered in the whole can enough of the bacilli to condemn the milk.    There are brought into *Milwaukee* from outside the city about 28,000 gallons of milk every day, drawn from more than 10,000 cows.    It would be practically impossible to subject this quantity of milk to a microscopic examination or to subject it to what is called in the evidence the centrifugal test, which would also require the use of a microscope although not to the same extent.    Each animal within the city can be subjected to an individual examination, a microscopic test of samples of its milk, an inspection as to its condition of health, and the tuberculin test applied directly under the orders of the health commissioner.    This is a sufficient basis for separate legislation relating to milk shipped into the city.    There are other regulations covering the sale of milk drawn from cows kept within the city.

It appears from other sections of the ordinance in evidence relating to cows within the city that the sale of milk from sick or diseased cows is forbidden, and that if in the opinion of the commissioner of health, bacteriologist, or any inspector any cow is afflicted with a contagious or infectious disease, such cow is to be removed to a place where it will not spread the infection.    It also appears that cows within the city and the milk and cream therefrom are under the authority of the commissioner of health and subject to strict inspection.    Under these ordinances the commissioner of health has very general authority and may no doubt apply any effective and known test to determine whether the animal so inspected is afflicted with tuberculosis or other disease.    These differences in the situation of the milk-producing animals and in the facilities for inspection and investigation are sufficient to authorize the common council to legislate with reference to milk shipped into the city and make police regulations applying to

dealers in and shippers of such milk separate from and differ-
ent from the regulations applying to cows within the city.
*Servonitz v. State,* 133 Wis. 231, 113 N. W. 237; *State v.*
*Evans,* 130 Wis. 381, 110 N. W. 241.

It is next contended that the ordinance is void because au-
thorizing the taking of private property without due process
of law, contrary to the XIVth amendment to the federal con-
stitution and to sec. 13, art. I, of the state constitution. In
support of this it is urged that the findings of the court below
establish that the plaintiff maintains a cleanly dairy farm and
sells the milk from healthy cows, and that the ordinance re-
quires the confiscation and destruction of this milk without
judicial determination of its unwholesomeness or judicial de-
termination that the milk is in fact unwholesome or produced
from diseased cows. When authorized by legislation, whether
contained in the municipal charter or in general statutes, mu-
nicipal corporations may enact and enforce ordinances for the
abatement of public nuisances and the preservation of the pub-
lic health. When the nuisance is abated by destruction of
property there must exist a necessity for resorting to this dras-
tic and unusual method of enforcement. A case must be pre-
sented in which the usual sanction of fine or imprisonment, or
the abatement by suit in court, or indeed any milder or slower
mode of dealing with the offender than destruction of his
property, would be inadequate to preserve the public health or
safety. *Salus populi suprema lex.* And in all ordinary
cases of destruction of property under such authority the prop-
erty owner may resort to the courts and recover his damages
by proving that the property which was destroyed as a nui-
sance or as dangerous to the public health or safety was not
such in fact. *Fath v. Koeppel,* 72 Wis. 289, 39 N. W. 539,
as explained and limited in *Lowe v. Conroy,* 120 Wis. 151, 97
N. W. 942, 66 L. R. A. 907; *Hubbell v. Goodrich,* 37 Wis.
84; *Godsell v. Fleming,* 59 Wis. 52, 17 N. W. 679; 1 Am. &
Eng. Ency. of Law (2d ed.) 93. In this way the law at-

tempts to harmonize the clash of legal rules and vindicate at once the right of property, including the right of the owner thereof to due process of law, and also the public right to preservation of its health and safety. The situation here disclosed, with about 3,500 eight-gallon cans of milk arriving daily in the city; the fact that the milk will sour and become practically worthless as a beverage in twenty-four hours or less of summer weather; the impossibility of imposing or enforcing fines provided in a city ordinance upon shippers residing and remaining out of the city; the fact that imprisonment of the offender would not prevent the milk reaching the consumer; the futility of proceeding by fine and imprisonment against the carrier or consignee; the impossibility of allowing this enormous quantity of milk to remain at the delivery depots reeking and rotting, a breeding place for pathogenic bacteria and insects during the period necessary for notice to the owner, and resort to judicial proceedings; together with the necessity for effectually preventing any of such milk from being used,—all establish a situation in which it may be said that the common council had the right to decide that destruction of the milk is the only available or efficient penalty for the enforcement of the ordinance and that such destruction was necessary. We cannot declare the ordinance unreasonable in this particular. *Nelson v. Minneapolis* (Minn.) 127 N. W. 445; *New Orleans v. Charouleau,* 121 La. 890, 46 South. 911, 18 L. R. A. N. S. 368.

We do not find it necessary to decide in this case whether the plaintiff could recover from the health commissioner or from the city for the destruction of his milk in case he should be able to prove that the milk was in fact clean, healthful, and free from the bacilli of tuberculosis. In determining the validity of this portion of the ordinance which provides for the destruction of property we must assume that the ordinance is otherwise valid. The plaintiff himself must by his own act expose his property to confiscation before this portion of the

ordinance will affect him injuriously, and there is a distinction recognized in some cases between pre-existing nuisances, abatement of which is sought, and nuisances created by wilfully placing property in the forbidden place or condition after the enactment of an ordinance and in defiance of it. *Blanke v. Genoa Junction,* 140 Wis. 211, 121 N. W. 132; *Miller v. Valparaiso,* 10 Ind. App. 22, 37 N. E. 418; *Baumgartner v. Hasty,* 100 Ind. 575; 1 Am. & Eng. Ency. of Law (2d ed.) 89, 93; *Childs v. Nelson,* 69 Wis. 125, 33 N. W. 587. We cannot, however, presume that the plaintiff will disregard the ordinance here held to be valid or place his property in a condition to invite its destruction. Self-inflicted damage is not recoverable. The open judicial inquiry is in such case, Was the damage self-inflicted?

With reference to the rulings on the admission of hearsay evidence from books and reports of scientific bodies: Where the trial is before the court without a jury the admission of such evidence is merely a mode in which the court may inform itself upon scientific subjects. The books, reports, etc., may be consulted without having been offered in evidence and it can do no harm to receive them in evidence. We cannot presume that the court gave them undue credence merely because they were formally offered in evidence. We find no ground for reversal of the judgment.

*By the Court.*—Judgment affirmed.