M. J. FEVOLD et al., Appellants, v. BOARD OF SUPERVISORS OF WEBSTER COUNTY et al., Appellees.

**CONSTITUTIONAL LAW:** Due Process—Bovine Tuberculosis Act. Due
1  process does not require that *notice* to the owners of breeding cattle
and *hearing* thereon be provided on an application to have a county
enrolled under the county-accredited-area plan for the eradication
of bovine tuberculosis. (See Book of Anno., Vol. 1, Const., Art. 1,
Sec. 9, Anno. 48 *et seq.*)

**CONSTITUTIONAL LAW:** Police Power—Effect of Federal Constitu-
2  tion. Principle reaffirmed that the states did not surrender their
police powers by the adoption of the Federal Constitution.

**CONSTITUTIONAL LAW:** Uniform Operation—County Testing Units.
The constitutional command that all acts shall be of "uniform operation" is not violated by the Bovine Tuberculosis Act because it operates through the medium of *county* testing units. (See Book of Anno., Vol. 1, Const., Art. I, Sec. 6; Art. III, Sec. 30.)

**ANIMALS:** Compulsory Testing—Agreements Required. An owner of breeding cattle who is validly required by statute to have them tested for tuberculosis or to submit to criminal prosecution may not complain that the law accords to him the right to enter into an agreement with the public authorities for his own protection.

**STATUTES:** Title—Non-reference to Tax. A tax may validly be authorized by an act, even though no mention of a tax be made in the title, if the tax is fairly calculated to effect the object covered by the title.

**CONSTITUTIONAL LAW:** Legislative Authority—Delegation. The statutory direction that the secretary of agriculture shall, in the administration of the Bovine Tuberculosis Act, certify to the county auditor the facts which render unnecessary a tax levy in the county, constitutes no delegation to an individual of discretionary legislative power. (See Book of Anno., Vol. 1, Const., Art. III, Sec. 1.)

**CONSTITUTIONAL LAW:** Police Power—Regulation of Curative Agencies. The state may, under its police power, validly control the sale, distribution, and administration of an agency (e. g., tuberculin) which is the basis upon which rest the efforts of the state to eradicate bovine tuberculosis.

**ANIMALS:** Bovine Tuberculosis Act—Compliance with Act. A petition for the enrollment of a county under the accredited-area plan for the eradication of bovine tuberculosis, and the agreements accompanying the petition, are all-sufficient if the statute be substantially complied with.

Headnote 1: 3 C. J. p. 50 (Anno.); 12 C. J. p. 763. Headnote 2: 12 C. J. p. 743. Headnote 3: 3 C. J. p. 50 (Anno.) Headnote 4: 3 C. J. p. 50 (Anno.); 12 C. J. p. 763. Headnote 5: 36 Cyc. p. 1044. Headnote 6: 37 Cyc. p. 725. Headnote 7: 3 C. J. p. 50 (Anno.) Headnote 8: 3 C. J. p. 50 (Anno.)

Headnote 2: 6 R. C. L. 191. Headnote 4: 18 A. L. R. 238. Headnote 5: L. R. A. 1917B, 812; 25 R. C. L. 859.

*Appeal from Webster District Court.*—G. D. THOMPSON, Judge.

SEPTEMBER 21, 1926.

REHEARING DENIED DECEMBER 16, 1926.

Action for injunction to restrain defendants from proceeding to enforce in Webster County certain provisions of the statute relating to the eradication of bovine tuberculosis. The petition was dismissed, and plaintiffs appeal.—*Affirmed.*

*Healy & Breen,* for appellants.

*James I. Dolliver* and *Price, Burnquist & McCall,* for appellees.

*Ben J. Gibson,* Attorney-general, and *Herbert A. Huff,* Assistant Attorney-general, *amici curiæ,* for the State.

VERMILION, J.—The plaintiffs are resident taxpayers of Webster County, and some of them are owners of breeding cattle. The defendants are the members of the board of supervisors, the county attorney, the sheriff, the auditor, and the treasurer of the county, and the secretary of the department of agriculture of the state. The relief asked was an injunction restraining the defendants from proceeding to enforce the statutes with reference to the suppression of bovine tuberculosis. The relief was denied below, and the petition dismissed; and from this judgment the appeal is taken.

1. CONSTITUTIONAL LAW: due process: Bovine Tuberculosis Act.

I. The appellants attack the constitutionality of the statutes at many points, on many grounds, and from many angles, and also question the validity of the proceedings theretofore taken under the statute. The acts involved are Chapter 287, Acts of the Thirty-eighth General Assembly, Chapter 48, Acts of the Fortieth General Assembly, and Chapter 23, Acts of the Extra Session of the Fortieth General Assembly. The present corresponding statutory provisions will be found in Chapter 129 of the Code of 1924, as amended.

Section 10, Chapter 287, Acts of the Thirty-eighth General Assembly, provided that owners of cattle might have them tested for tuberculosis, on application to the commission of animal health, and the execution of an agreement to conform to and abide by the rules and regulations laid down by the commission, and to follow the instructions of the commission designed to

prevent the reinfection of the herd. The section further provided for the appraisal of the animals to be tested, and for the payment of a portion of the appraised value of cattle which it was found advisable to slaughter.

By Chapter 48, Acts of the Fortieth General Assembly, the foregoing act was amended by adding thereto provisions for the establishment of what was designated as the ''county-area'' and the ''county-accredited-area'' plans of eradicating bovine tuberculosis. Chapter 48 went into effect July 4, 1923. Section 10-b thereof is as follows:

''Whenever a petition signed by fifty-one per cent of the owners of breeding cattle within the county, as shown by the assessor's reports, together with agreements as provided in Section 10 hereof, shall be presented to the board of supervisors, the board shall make application to the commission of animal health of the state for the enrollment of said county under the county area plan and shall, at the same time, forward to the commission of animal health the agreements signed as provided herein. The commission of animal health shall, when it receives agreements signed by fifty-one per cent of the owners of breeding cattle within such county, designate such county as a county area testing unit and it shall forthwith proceed with the eradication of bovine tuberculosis in such county under the county area plan as provided herein.''

By Section 10-f it was provided that the commission of animal health, when it had designated any county as an area for the eradication of tuberculosis under the county-area plan, should make provision for the testing of the cattle of such owners as had signed agreements therefor.

Section 10-d provided that the board of supervisors of such county should levy a tax of not more than three mills on the dollar on the taxable property in the county, the proceeds of which should be known as the county-tuberculosis-eradication fund.

In September, 1923, there was filed in the office of the county auditor of Webster County a petition addressed to the board of supervisors, signed by 51 per cent of the owners of breeding cattle in the county, asking the board to make application to the state department of agriculture for the enrollment of the county under the county-area plan, and containing an

agreement that the signers would permit their herds to be examined and tuberculin-tested, and would conform to and abide by all rules and regulations laid down, or which might be adopted, by the department. The board of supervisors thereupon adopted a resolution finding the petition sufficient, making such application, and levying a tax of two mills on the taxable property in the county for the eradication fund. In 1924, the board levied a like tax in the sum of $33,000.

Thereafter, Chapter 23 of the Acts of the Special Session of the Fortieth General Assembly was enacted, and went into effect by publication on March 10, 1924. Section 25 thereof was as follows:

"Whenever 75 per cent of the owners of breeding cattle in any county operating under the county area plan, shall have signed agreements with the department of agriculture, the department shall enroll the county under the accredited area plan and notify the board of supervisors of such county accordingly. The board shall cause to be published a notice of such enrollment once in two official newspapers of the county and thereafter every owner of breeding cattle within the county shall cause his cattle to be tested for tuberculosis as provided in this act and shall comply with all the requirements for the establishment and maintenance of a tuberculosis-free accredited herd."

It was stipulated by the parties on the trial below that Webster County was enrolled under the accredited-area plan in October, 1924. A veterinary inspector for Webster County was appointed by the state secretary of agriculture. He testified that it was his purpose and intention to continue in the work of testing cattle for tuberculosis and to quarantine or condemn them, as his judgment dictated, if he believed they had tuberculosis, unless restrained by injunction. The record discloses no other acts or purpose on the part of the defendants, nor was it shown that any of the plaintiffs have been, or will be, affected thereby, save as taxpayers and as the owners of breeding cattle in the county are necessarily affected.

Some apparent confusion of terms in designating the state official or body in whom authority is vested under the various acts is readily explained by the fact that, by Chapter 46, Acts of the Fortieth General Assembly, the commission of animal health was consolidated with the state department of agricul-

ture, the office of secretary of agriculture was created, and such officer was invested with all the powers and duties of the commission. *Peverill v. Board of Supervisors*, 201 Iowa 1050.

We assume, although the record before us is silent on the subject, that the appellants did not sign the agreements contemplated by the statute for the testing of their herds, and agree to conform to and be bound by the rules and regulations of the department of agriculture. As pointed out in *Peverill v. Board of Supervisors*, supra, upon the enrollment of the county under the county-area plan provided for in Section 10-b, Chapter 48, Acts of the Fortieth General Assembly, the only inspection by that section authorized was of the herds of such owners as had signed such agreements. Of this plaintiffs cannot complain. It was only when the county had been enrolled under the accredited-area plan that plaintiffs, as the owners of breeding cattle, could be affected by the provisions of the statute relating to compulsory inspection and testing, which were being carried out by the appellees.

It is the contention of appellants that Section 25, Chapter 23, Acts of the Extra Session of the Fortieth General Assembly, requiring any owner of breeding cattle in any county which has come under the county-area-accredited plan to have his cattle tested for tuberculosis, violates the constitutional provision requiring due process of law, in that it fails to provide for notice and a hearing upon the application of 75 per cent of the owners of breeding cattle in the county, for the enrollment of the county as an accredited area.

The only way in which it can be said, under the facts appearing in the record, that appellants will certainly be affected by the enrollment of the county as an accredited area, aside from the matter of taxation to be presently considered, is that it requires them to have their breeding cattle tested for tuberculosis. It is not shown that any of their cattle have been tested, and claimed to be infected, and are about to be quarantined or slaughtered, or that any penal provisions of the statute are about to be invoked against them. There is no showing that they have been, or are about to be, deprived of any property, or that any of their property will be taken for public use. The utmost that appears is that they are required to have their cattle tested. If their animals should be found to be

free from the disease, that is the end of the matter.  We will not assume that their cattle will be found to be infected, for the purpose of questioning the validity of statutory provisions that might, in such case, be invoked.

We think there can be no doubt that the legislature, in the exercise of the police power, may require breeding cattle to be tested for tuberculosis, and provide reasonable measures for carrying out the requirement.

The United States Supreme Court has said that, while "the police power cannot be put forward as an excuse for oppressive and unjust legislation, it may be lawfully resorted to for the purpose of preserving the public health, safety, or morals, or the abatement of public nuisances, and a large discretion 'is necessarily vested in the legislature to determine not only what the interests of the public require, but what measures are necessary for the protection of such interests.' "   *Holden v. Hardy,* 169 U. S. 366 (42 L. Ed. 780).  See, also, *Lawton v. Steele,* 152 U. S. 133 (38 L. Ed. 385).

The police power extends to the enactment of all laws which, in contemplation of the Constitution, are reasonably necessary to promote the welfare of the public, as distinguished from the interests of a particular class.  *State v. Redmon,* 134 Wis. 89 (114 N. W. 137).

In *City of Des Moines v. Manhattan Oil Co.,* 193 Iowa 1096, Justice Weaver, speaking for the court, said:

"The power to designate the subject of police regulation rests in the state alone; and if a given statute is not clearly repugnant to some constitutional guaranty, the courts are without power to interfere.  Such interference, if tolerated at all, must be on the theory that the subject of the regulation is not within the legislative jurisdiction; or, if the subject be one within such jurisdiction, it must appear to the court that, looking through mere forms, and at the substance of the matter, it can say that the statute, enacted professedly in the interest of the public or general welfare, 'has no substantial relation to that object, but is a clear, unmistakable infringement of rights secured by the fundamental law.'  *Booth v. Illinois,* supra; *Overton v. Harrington,* 126 Md. 32 (94 Atl. 325).  The legislature, acting within these limits, is the sole judge as to all matters pertaining to the public policy, wisdom, and expediency

of the police regulations which it prescribes *(State v. Armour Pkg. Co.,* 124 Iowa 323, 12 Corpus Juris 932); and while the police power is familiarly exercised in regulations to promote the public health and morals, it extends as well to the promotion of 'public convenience and general prosperity.' *Chicago, B. & Q. R. Co. v. People of Illinois,* 200 U. S. 561, 592.''

"It [the police power] is universally conceded to include everything essential to the public safety, health, and morals, and to justify the destruction or abatement, by summary proceedings, of whatever may be regarded as a public nuisance. Under this power it has been held that the state may order * * * the slaughter of diseased cattle * * *.'' *Lawton v. Steele,* 152 U. S. 133 (38 L. Ed. 385).

Neither the Fourteenth Amendment nor any other amendment was designed to interfere with the police power of the state to prescribe regulations to promote the

2. CONSTITUTIONAL LAW: police power: effect of Federal Constitution.

health, peace, morals, education, and good order of the people. *Barbier v. Connolly,* 113 U. S. 27 (28 L. Ed. 923); *Bittenhaus v. Johnston,* 92 Wis. 588 (66 N. W. 805, 32 L. R. A. 380). In *Jacobson v. Massachusetts,* 197 U. S. 11 (49 L. Ed. 643), in upholding a statute authorizing local boards of health to enforce vaccination against smallpox, the court observed:

"The authority of the state to enact this statute is to be referred to what is commonly called the police power,—a power which the state did not surrender when becoming a member of the Union, under the Constitution. Although this court has refrained from any attempt to define the limits of that power, yet it has distinctly recognized the authority of a state to enact quarantine laws and 'health laws of every description;' indeed, all laws that relate to matters completely within its territory, and which do not by their necessary operation affect the people of other states. According to settled principles, the police power of a state must be held to embrace at least such reasonable regulations established directly by legislative enactment as will protect the public health and the public safety. * * * It is equally true that the state may invest local bodies, called into existence for purposes of local administration, with authority in some appropriate way to safeguard the public health and the public safety.''

In *Houston v. State,* 98 Wis. 481 (74 N. W. 111, 42 L. R. A. 39), the Supreme Court of Wisconsin said:

"It is fairly established, by adjudications too numerous to mention, that a state may, in the proper exercise of its police power, authorize the destruction of such property as has become a public nuisance, or has an unlawful existence, or is noxious to the public health, public morals, or public safety, without compensation, notwithstanding the prohibition in Sec. 1, Art. XIV, of the Amendments to the Constitution of the United States."

See, also, *Adams v. City of Milwaukee,* 144 Wis. 371 (129 N. W. 518), where a city ordinance prohibiting the sale within the city of milk except from cows that had been tuberculin-tested was sustained, and it was said that the city council had the right to decide that the destruction of milk from untested cows was the only available or efficient method of enforcing the ordinance.

In *Durand v. Dyson,* 271 Ill. 382 (111 N. E. 143), it is said:

"Prevention of the spreading of dangerous diseases among cattle is now universally recognized in this country as within the domain of the police power, as it is so essential to the public safety and health."

And further:

"It must be presumed by this court that the legislature has carefully investigated, and has properly determined that the interests of the public require legislation that will insure the public safety and the public health against threatened danger from diseased animals. The determination of that fact is the province of the legislature, and not of the courts. It is also the province of the legislature, and not of the courts, to determine what measures are necessary for the protection of such interests."

In *North American Cold Storage Co. v. City of Chicago,* 211 U. S. 306 (53 L. Ed. 195), there was involved the constitutionality of an ordinance of the city providing for the seizure and destruction of articles of food found to be decayed or infected, without notice or an opportunity to be heard. The court, in upholding the ordinance, said:

"We are of opinion, however, that provision for a hearing

before seizure and condemnation and destruction of food which is unwholesome and unfit for use, is not necessary. The right to so seize is based upon the right and duty of the state to protect and guard, as far as possible, the lives and health of its inhabitants, and that it is proper to provide that food which is unfit for human consumption should be summarily seized and destroyed, to prevent the danger which would arise from eating it."

With reference to the further contention that no emergency existed, requiring the summary seizure and destruction of the property, the court said:

"We think, when the question is one regarding the destruction of food which is not fit for human use, the emergency must be one which would fairly appeal to the reasonable discretion of the legislature, as to the necessity for a prior hearing, and in that case its decision would not be a subject for review by the courts."

In *Richter v. State*, 16 Wyo. 437 (95 Pac. 51), the Supreme Court of Wyoming said, in reference to a statute that conferred upon any inspector of sheep, either Federal or state, the authority to inspect, quarantine, and treat sheep affected with contagious or infectious diseases, or suspected of being so infected, or that had been exposed to any such disease:

"A conferred power of this nature is not inhibited by the Constitution, because it is the method, and practically the only method, by which the state can enforce its police regulations. The law is essentially of that nature, and the protection sought and the object to be attained must be by a summary method, and the state must act, and act quickly, through its agents, who are clothed with certain powers in the performance of the duty."

The same court, in *Arbuckle v. Pflaeging*, 20 Wyo. 351 (123 Pac. 918), said, of a statute that gave to the state veterinarian the power, as a sanitary measure, to inspect and compel the dipping, spraying, or other sanitary treatment, as might be determined by the veterinarian, of any cattle infected with contagious or infectious disease, that it was in the nature of a police regulation, and not inhibited by the Constitution.

In *City of New Orleans v. Charouleau*, 121 La. 890 (46 So. 911, 18 L. R. A. [N. S.] 368), the defendant refused to permit the veterinarian of the board of health to administer the tuberculin test for tuberculosis to one of his cows, and was prosecuted

and convicted, under an ordinance providing that no cow should be used in a dairy or dairy farm unless it should be so tested, and providing for the slaughtering of such animals found to be affected with the disease. The ordinance was sustained, as within the authority delegated to the city council, and not a denial of due process of law, although no provision was made for compensation for animals destroyed as being affected with tuberculosis. With reference to the objection that the ordinance did not provide for a judicial hearing before the animal could be destroyed, the court said:

"Would it be practical in a large city to institute a judicial inquiry in the case of every diseased cow in every dairy? Impure food, decayed fish, meats, and vegetables, are subjected to the doom of the inspector, without appeal. We see no reason why in a large city the same should not be done with dairy cows which, by a test recognized to be practically infallible, are found to be a serious menace to the public health."

The Supreme Court of Mississippi, in *Hawkins v. Hoye*, 108 Miss. 282 (66 So. 741), sustained as constitutional an ordinance of the state board of health that required a semiannual inspection of dairy cows. The court said:

"Statutes establishing boards of health for the purpose of advancing the public health by investing such boards with the power to adopt ordinances, rules, and regulations necessary to secure such objects are not unconstitutional as being a delegation of legislative power  *  *  *  . The regulation is within the police power of the state. It is in aid of good health, and consequently tends to the welfare and safety of the people. Tuberculosis is a disease dangerous and destructive to human life. It is recognized that tuberculosis may be communicated to human beings by the use of milk from cows infected with the disease. Therefore it was proper for the board of health, the body empowered and enjoined by the statute to supervise the health interest of the people and to prevent the spread of epidemic diseases, to make the regulation."

In the recent case of *Schulte v. Fitch*, 162 Minn. 184 (202 N. W. 719), a law of the state of Minnesota similar to our own was upheld. It was said that the statute was clearly a measure for the protection of the public against disease; that laws for controlling and suppressing disease and for promoting the pub-

lic health were always given a broad and liberal construction, that they might accomplish the purpose intended in enacting them; that the state might make municipalities or other territorial subdivisions its agencies in performing its governmental functions; that by the statute the state made the counties, as well as the live-stock sanitary board, a part of the governmental machinery for protecting and preserving the public health; and that the power to be exercised and the duties to be performed by a county under it were to be exercised and performed merely as by a governmental agency. The court, with respect to the complaint that the act was permissive, and not mandatory, and did not go into effect in a county until the county board, on petition of a majority of the cattle owners of the county, had made an appropriation to aid in defraying the expense of making the tests, said:

"A law may permit, as well as command. Here the state offers substantial financial aid and the services of the state live-stock sanitary board, with its corps of veterinarians, in suppressing the disease in any county which will make the required appropriation. It could have made compliance with the act compulsory. Instead, it permits each county to determine for itself, through its board of county commissioners, whether the 'area plan' for eradicating the disease shall be put into effect and enforced within such county."

In *Waud v. Crawford*, 160 Iowa 432, we recognized the general principles announced in the foregoing cases, and said:

"While the police power is very broad, and not capable of exact definition, it is not boundless, and, as a rule, is subject to constitutional limitations. Property may be destroyed under this power, without notice or opportunity to be heard, and, without compensation to the owner, to prevent the spread of contagious diseases, to stay the progress of a devastating fire, and in other exigencies where the public needs protection or defense."

Again, in *City of Des Moines v. Manhattan Oil Co.*, supra, we said:

" * * * the power of eminent domain is quite distinct from the police power, and for the incidental loss or injury which the individual member of the public may sustain by reason of valid police regulations, no compensation is recoverable. There is in such cases 'no divesting of property rights by the operation

of the statute, and the regulation to which the exercise of such rights is thereby subjected is not prevented by any limitation upon the authority of the legislature prescribed by Federal or state Constitution.' ''

The proper exercise of the police power is not limited to the suppression of what were nuisances at common law; nor is it necessary that the evil sought to be remedied be declared a nuisance by the statute itself, so long as the object to be attained was one that could properly be reached by the police power. *City of Des Moines v. Manhattan Oil Co.*, supra. But in *Durand v. Dyson*, supra, it is said:

''Cattle afflicted with a dangerous and contagious disease are public nuisances, as defined by the common law, and under the common law such a nuisance could not be legalized, because it invaded the peace and safety of the people.''

It is apparent that the cited cases go much further than we are required to in the present instance. The only question before us, at this point, is the constitutionality of the statute requiring all breeding cattle within an accredited area to be tested for tuberculosis, where the statute then in force failed to provide for notice and an opportunity for a hearing on the creation of the accredited area. This objection, it may be remarked, has been met in the later statutes, Section 5, Chapter 54, Acts of the Forty-first General Assembly.

It is clear from the foregoing cases that the legislature had power to determine that the interests of the public health required the testing of cattle for tuberculosis, and to determine, in the exercise of a reasonable discretion, what measures should be taken to that end, and whether, in the creation of the accredited area within which such testing should be compulsory, notice and an opportunity to be heard should be given.

II.   The objection that the accredited area within which compulsory testing is required is limited to the county, and that, therefore, the law is not of uniform operation, is without merit.

3. CONSTITUTIONAL LAW: uniform operation: county testing units.     *Northwestern Laundry v. City of Des Moines,* 239 U. S. 486 (60 L. Ed. 397); *City of Des Moines v. Manhattan Oil Co.*, supra. The statute under which the proceedings in question were taken, provided for the publication of notice that the county had been enrolled under the accredited-area plan, and owners of breeding

cattle were given 90 days within which to have their cattle tested. A further written notice was required to be served on the owner 15 days before the commencement of proceedings for a violation of the statute. Sections 25, 28, and 29, Chapter 48, Acts of the Extra Session of the Fortieth General Assembly. It cannot be said that this was an unreasonable measure for the enforcement of the provision for testing, which we hold that the legislature had power to make.

Many of the cases above referred to, as well as cases cited by appellants, recognize the doctrine that an ex-parte determination that animals are suffering from a contagious or infectious disease is not conclusive on the owner, and that the question whether they were in fact so afflicted may be determined in an action by the owner for the destruction of his property. But this goes to the remedy of the owner in case his property was destroyed without his agreement, and when, in fact, it was not subject to destruction, and not to the validity of statutes requiring cattle to be tested.

III. In this connection it may be well to notice appellants' contention that the statute required the owner of breeding cattle in an accredited area to enter into an agreement for the testing of his cattle. The provision (Section 28, Chapter 23, Acts of the Fortieth General Assembly, Extra Session) is in the alternative, and provides that, if he fails to enter into such agreement or to have his cattle tested, he is liable to the prescribed penalties. The provision relative to the agreement is clearly for the owner's benefit. The positive requirement of the statute is that he have his cattle tested, not that he do both.

4. ANIMALS: compulsory testing: agreements required.

IV. The provision for the appraisement of cattle before testing (Section 5, Chapter 23, Acts of the Extra Session of the Fortieth General Assembly) is also for the owner's benefit, and to enable him to secure the compensation provided for in the statute, if his cattle are found to be affected and are destroyed. We are not called upon to determine, under the facts presented by the record, what consequences might ensue in case of his failure to agree to, or participate in, the appraisement. The right, in the exercise of the police power, to destroy without compensation animals suffering from contagious disease has been, as we have seen, frequently upheld. Whether, in the ab-

sence of an agreement for, or participation in, the appraisement provided for by the statute, the owner would be entitled to recover against those who should destroy cattle not afflicted with disease, is a question not before us, and upon it we express no opinion.

Nor do the instant facts require a determination as to what agreement of the appraisers designated to act in case the owner and a representative of the state or Federal department of agriculture are unable to agree, is required, or as to what result would follow if they did not agree.

We think that the rule laid down in *Wolff Packing Co. v. Court of Industrial Relations*, 267 U. S. 552 (69 L. Ed. 785), relating to "compulsory arbitration" between private parties, has no application to the situation here presented.

V.   Complaint is made of the action of the board of supervisors in levying a tax on the taxable property of the county for the years 1923 and 1924 for the county-tuberculosis-eradication 5. STATUTES: title: fund.   The imposition of such a tax was ex-
non-reference to
tax.                pressly provided for by Section 10-d, Chapter 48, Acts of the Fortieth General Assembly, which was in effect at the time of the levy for the year 1923, and by Section 21, Chapter 23, Acts of the Extra Session of the Fortieth General Assembly, in effect at the time of the second levy.

But it is said that these statutes are invalid for the reason that no mention was made in the title of either act of the authority to levy such tax.

Section 29 of Article III of the Constitution of the state provides:

"Every act shall embrace but one subject, and matters properly connected therewith; which subject shall be expressed in the title."

The title to Chapter 48, supra, is as follows:

"An act to amend Chapter two hundred eighty-seven (287), Acts of the Thirty-eighth General Assembly, as amended by the Acts of the Thirty-ninth General Assembly (C. C. Title VIII, Chapter 15), so as to permit the establishment of additional methods for the eradication of bovine tuberculosis and to promote the health and welfare of the citizens of the state."

Neither Chapter 287, Acts of the Thirty-eighth General Assembly, nor the amendment thereof by the thirty-ninth general

assembly, provided for a tax. The title to Chapter 23, supra, recited that it was an act to repeal certain designated sections, "relating to the eradication of bovine tuberculosis, and to enact a substitute therefor."

It is the uniform rule that this constitutional requirement is not to be given a narrow or limited construction. It is not intended to prohibit the writing in one bill of any number of provisions having one general object, fairly indicated by the title; and it is not necessary that the title shall be an index of the details of the act, nor that every provision of the several sections of the statute be enumerated in the title. *In re Estate of Pedersen,* 198 Iowa 166, and cases cited.

"It is admissible to include in a statute means which are reasonably adapted to secure the objects indicated by the title." *Cook v. Marshall County,* 119 Iowa 384.

In the case last cited, we held, after an extensive review of authorities, that there could properly be included in an act entitled "an act to revise, amend and codify the statutes in relation to crimes and their punishment," a provision for a tax against the person selling cigarettes and the property where cigarettes were sold.

Everything connected with the main purpose and reasonably adapted to secure the objects indicated by the title may be embraced in the act, without violating the constitutional inhibition. *Lynch v. Chase,* 55 Kan. 367; *State ex rel. Jackson v. Topeka Club,* 82 Kan. 756 (109 Pac. 183, 29 L. R. A. [N. S.] 722).

The imposition of a tax to provide funds for the carrying out of the statutes was so clearly adapted to secure the object of the acts as indicated in the titles that we are of the opinion that there was here no violation of the constitutional provision. *Wilkinson v. Lord,* 85 Neb. 136 (122 N. W. 699, 24 L. R. A. [N. S.] 1104); *Lang v. Board of Supervisors,* 114 Miss. 341 (75 So. 126); *Wilkinson v. Lyon* (Tex. Civ. App.), 207 S. W. 638; *City of Knoxville v. Ft. Sanders Hospital,* 148 Tenn. 699 (257 S. W. 408); *People ex rel. Gibbons v. Clark,* 296 Ill. 46 (129 N. E. 583).

VI. It is urged that the provision of the statute authorizing the board of supervisors to levy a tax for the eradication

fund is in violation of Section 7 of Article VII of the state Constitution, providing:

"Every law which imposes, continues, or revises a tax, shall distinctly state the tax, and the object to which it is to be applied; and it shall not be sufficient to refer to any other law to fix such tax or object."

Broadly speaking, this contention is met in the case of *Youngerman v. Murphy*, 107 Iowa 686. We there said, of an act that authorized certain cities to levy a tax to create a sinking fund to be used in the purchase or erection of waterworks:

"Sufficient answer to this claim [of unconstitutionality] is found in the fact that the act itself does not impose a tax. It authorizes certain cities to do so, and is a valid delegation of power to municipal bodies."

Moreover, the object of the tax is expressly stated in the act, and the manner of its disbursement; nor is it a valid objection that its use for the payment for cattle slaughtered is only authorized when funds provided by the state and Federal governments allotted to the county for that purpose have been exhausted.

VII.    Complaint is further made that Section 2689 of the Code of 1924 requires the secretary of agriculture to so certify to the county auditor when the balance in the eradication

6. CONSTITUTIONAL LAW: legislative authority: delegation.

fund is sufficient, with the county's allotment of state and Federal funds available, to carry on the work in the county for the ensuing year, in which case the board shall make no levy for the eradication fund. It is said that this is an invalid delegation of a discretionary legislative power to an individual; and reliance is put upon *State v. Mayor*, 103 Iowa 76. It was held in that case that a statute authorizing a library board, appointed by the mayor, to fix and determine the amount of a library tax which the city council was then required to levy, was invalid. It was said that the right to fix and determine was equivalent to the right to levy, and that the legislature had no power to vest the levying of the tax in a body not directly responsible to the people of the city. We think the principle there announced is not controlling under the situation presented here. The statute does not delegate to the secretary of agriculture the power to determine the amount of the tax or to levy the tax. The board

of supervisors is required by statute to levy the tax if the county is enrolled under the county-area or the accredited-area plan, and to determine its amount, within the statutory limitation; and to make no levy only when the secretary of agriculture certifies certain facts to the board. His act, or his failure to act, imposes no burden upon the taxpayer. That is imposed, under express authority of the statute, by the board.

VIII. Section 2678, Code of 1924, is as follows:

"The department shall have control of the sale, distribution, and use of all tuberculin in the state, and shall formulate rules for its distribution and use. Only a licensed veterinarian shall apply a tuberculin test to cattle within this state."

It is urged that this statute creates a monopoly in the sale, distribution, and use of tuberculin and in the work of testing cattle.

The police power of the state may properly be exercised in regulating the practice of medicine, and it is no arbitrary or unlawful discrimination to provide that only those possessed of the requisite skill and knowledge, which shall be evidenced by a certificate of a board designated by the state to ascertain their fitness, shall be permitted to practice. Such a regulation deprives no one of the right to practice, but only requires of him certain qualifications. *State v. Bair,* 112 Iowa 466; *State v Heath,* 125 Iowa 585; *State v. Wilcox,* 64 Kan. 789 (68 Pac. 634); *Williams v. People,* 121 Ill. 84 (11 N. E. 881).

7. CONSTITUTIONAL LAW: police power: regulation of curative agencies.

The same police power affords authority for the state to control and regulate the sale of medicines that may and do affect the health of the people, if only in order to insure their purity. *State Board of Pharmacy v. Matthews,* 197 N. Y. 353 (90 N. E. 966, 26 L. R. A. [N. S.] 1013); *Commonwealth v. Payne Medicine Co.,* 138 Ky. 164 (127 S. W. 760); *State v. Donaldson,* 41 Minn. 74 (42 N. W. 781).

The purpose of the law in question is the promotion of the public health by the eradication from breeding cattle of a disease that is said to be communicable to humans by the use of milk from infected cows, and perhaps through other channels. The tuberculin test is the administration hypodermically of tuberculin, a culture growth of the tubercle bacillus, which causes an ascertainable reaction in cattle afflicted with the

disease. Manifestly, the efficiency of the test and the efficacy of all measures for the eradication of the disease among cattle, resting, as they do, upon the test, must depend upon the purity and effectiveness of the tuberculin, its proper administration, and an accurate observation of the effect.

We think it is clearly within the power of the state to exercise, through its department of agriculture, control over the distribution and sale of the article whose use is the basis of the entire effort to eradicate bovine tuberculosis, and to confine its use for that purpose to the hands of veterinarians licensed by the state.

IX. Appellants are in no position to question the validity of the provision making it a misdemeanor for the owner in an accredited area to fail to have his breeding cattle tested. There is no showing that any attempt has been or is about to be made to enforce such provision, or even that any of the appellants are liable to prosecution thereunder.

X. The same thing is true of the provision authorizing the department of agriculture on its own motion to make an examination of any herd. The record discloses no action or attempted action under that provision.

XI. Complaint is made that the agreements signed by owners of breeding cattle, which were the basis for enrolling the county as an accredited area, did not conform to the statute.

8. ANIMALS: Bovine Tuberculosis Act: compliance with act. They did not follow the wording of the statute (Section 10, Chapter 287, Acts of the Thirty-eighth General Assembly), but the obligation assumed was substantially that required. There is no merit in the complaint.

We agree with the trial court. The petition was properly dismissed, and the judgment is—*Affirmed.*

EVANS, STEVENS, ALBERT, and MORLING, JJ., concur.

DE GRAFF, C. J., and FAVILLE, J., not participating.