### CITY OF EL PASO et al. v. JACKSON et al.
### No. 1433—6073.

Commission of Appeals of Texas, Section B.
May 3, 1933.

J. H. McBroom and J. W. Morrow, both of El Paso, for plaintiffs in error.

Jones, Goldstein, Hardie & Grambling and Fryer & Cunningham, all of El Paso, for defendants in error.

RYAN, Judge.

Defendants in error attack an ordinance of the city of El Paso which prohibits the sale within that city of ice manufactured outside the city unless it be made of distilled water, on the ground the ordinance is void because it discriminates against persons manufacturing ice outside the city as contrasted to persons manufacturing ice inside the city, and on the further ground that the ordinance prohibited the sale of a pure and wholesome commodity of commerce and was a burden on interstate commerce.

The trial court, being of the opinion that the ordinance is void, perpetually enjoined the city, its mayor, aldermen, chief of police, and judge of the corporation court, from arresting and prosecuting defendants in error for any violation thereof and from enforcing or threatening to enforce said ordinance or any of its provisions.

The trial court's action was based upon his conclusion that the ordinance is discriminatory and imposes a burden on interstate commerce.

With Mr. Justice Higgins dissenting, a majority of the Court of Civil Appeals affirmed the judgment of the trial court. 40 S.W.(2d) 845.

The ordinance in question (omitting caption) reads as follows:

"Whereas the public health authorities of the City of El Paso are empowered within the City of El Paso to inspect the methods used in the manufacture and storage of ice, and to test the wells from which the water is obtained, and to supervise the sanitary methods surrounding the manufacture and storage thereof.

"And whereas it is impractical to inspect and test for purity, ice manufactured outside the City of El Paso.

"Now therefore, to guard the public health against typhoid fever and other diseases, the germs of which may be transmitted in ice, be it ordained by the City Council of the City of El Paso, Texas:

"Sec. 1: It shall be unlawful for any person, firm or corporation to sell or offer for sale, or distribute in the City of El Paso any ice manufactured outside the City of El Paso, except ice manufactured wholly with distilled water.

"Sec. 2: Any person violating the foregoing ordinance shall be deemed guilty of a misdemeanor, and shall be fined the sum of $10.00, and each sale, or offering for sale, shall constitute a separate offense.

"Sec. 3: There being no sufficient ordinance now forbidding or preventing the sale of impure ice within the City of El Paso, manufactured outside the City of El Paso, creates a case of great public emergency, necessitating the suspension of the rule requiring ordinances to be read in open meeting of the City Council at two regular meetings as provided in Sec. 33 of the Charter of the City, and for that reason said rule is hereby suspended by unanimous vote of the Aldermen present and with the consent of the Mayor, and this ordinance is hereby passed and ap-

proved, and takes effect upon its passage, approval and publication.

"Passed and approved the 2nd day of April A. D. 1931."

The defendants in error are engaged in the business of selling ice in the city of El Paso, such ice manufactured out of raw water, in the city of Juarez, Republic of Mexico, and brought by them from Mexico, in trucks and wagons.

One of them has invested in that business property valued at more than $500, and the others have invested in their business property valued at more than $500.

The record discloses that ice is a suitable agent to transmit the germs of typhoid fever and other diseases, that the freezing of water does not destroy bacteria or typhoid germs in water, and sand filtering does not destroy bacteria. It requires forty-eight hours to test ice for contamination. If ice is held for forty-eight hours to be tested, it will melt and be destroyed. It is therefore impossible to test for contamination any ice brought into the city from beyond its limits. Distillation of water eliminates all germs and gives the assurance that ice manufactured from distilled water is free from contamination by disease-carrying germs.

The city of El Paso has no way of enforcing periodic and proper inspection of the water sources in Juarez from which the ice is manufactured.

Within the city of El Paso, water from which ice is made is tested as to its purity by the city health department, and if colon bacteria be discovered, corrective steps are taken.

It was agreed between counsel for the parties that the city health officer of El Paso inspects the purity of the raw water used in that city every two weeks.

The city health officer testified that without weekly laboratory tests of city water it cannot be told whether any water is pure or not and that he takes periodical tests to keep it pure.

It appears that there are five ice manufacturing plants in El Paso, three being distilled water plants, one of which also manufactures a part of its product out of raw water.

There was a conflict in testimony as to the relative cost of manufacturing ice out of distilled or raw water, some of it to the effect that the former is the more expensive, and some to the effect that the cost of manufacturing distilled water ice, with a properly efficient plant, is less than the other.

### Opinion.

Much has been written on the subjects of controversy herein, but we think they have been settled adversely to defendants in error by the Supreme Court of the United States in Adams v. City of Milwaukee, 228 U. S. 572, 33 S. Ct. 610, 57 L. Ed. 971, and the doctrine there announced, applicable to a city's milk supply, is applicable here to the city's ice supply.

That case involved the validity of an ordinance of the city. of Milwaukee which prohibited bringing into the city, or selling or offering for sale therein, milk or cream drawn from cows outside of said city unless (among other requirements) the owner of such cows had filed in the office of the health commissioner a certificate from a duly licensed veterinary surgeon or other person given authority by the State Live Stock Sanitary Board to make tuberculin tests, that such cows had been tested with tuberculin and found free from tuberculosis or other contagious diseases.

Such a test is made by a hypodermic injection of a toxic product of the tubercule bacilli, which causes a described and recognized rise of temperature in the animal afflicted with tuberculosis, but has no effect, or a different effect, upon cattle not so afflicted. The tuberculin test, while not infallible, is the only reliable and useful means for testing cattle for tuberculosis.

It was contended that the ordinance is unconstitutional, in that it is partial and unequal in its operation as it applies to dealers in milk drawn from cows outside the city, while dealers in milk drawn from cows within the city are not included in its terms or subject to its requirements.

The Supreme Court of Wisconsin (Adams v. City of Milwaukee, 144 Wis. 371, 129 N. W. 518, 43 L. R. A. [N. S.] 1066) held that when these two classes of milk dealers are considered from the viewpoint of facility for inspection and regulation, important differences are at once perceptible. The city officers intrusted with the preservation of the public health cannot visit or exercise authority on farms outside the city limits and in other counties. Cows within the city are under the authority of the commissioner of health and subject to strict inspection. Therefore, these differences in the situation of the milk producing animals and in the facilities for inspection and investigation are sufficient to authorize the common council to legislate with reference to milk shipped into the city and make police regulations applying to dealers in and shippers of such milk, separate from and different from the regulations applying to cows within the city.

The Supreme Court of the United States reviewed that case on writ of error to the Supreme Court of Wisconsin (228 U. S. 572, 33 S. Ct. 610, 57 L. Ed. 971), concurred in the findings of, and affirmed the judgment of, the state court.

We see no difference in principle between that case and the one under consideration.

In the one case foreign cows producing the milk must be injected with tuberculin; in the other, water out of which foreign ice is produced must be distilled.

In the Adams Case, he claimed the ordinance unreasonable and void because it prohibited commerce in pure, wholesome milk from cows outside the city; here, the defendants in error claim the ordinance is unreasonable and void because it prohibits commerce in pure, wholesome ice made outside the city.

We are cited to State of Minnesota v. Barber, 136 U. S. 313, 10 S. Ct. 862, 867, 34 L. Ed. 455, as sustaining a contrary view; we are of the opinion that case is materially differentiated from this. There, the state of Minnesota had enacted a statute which prohibited the sale of meat in the state unless the animal had been inspected by a local officer within twenty-four hours before its slaughter. The effect of the statute was to require fresh meats of every kind, before their introduction into Minnesota, to be locally inspected there, on the hoof, within twenty-four hours before slaughter—an impossibility in case of residents of other states who were thus required to ship the live animal into Minnesota for inspection within twenty-four hours of slaughter and shipped back for butchering. The court said:

"One other suggestion by the counsel for the state deserves to be examined. It is that, so far as this statute is concerned, the people of Minnesota can purchase in other states fresh beef, veal, mutton, lamb, and pork, and bring such meats into Minnesota for their own personal use. We do not perceive that this view strengthens the case of the state, for it ignores the right which the people of other states have in commerce between those states and the state of Minnesota, and if ignores the right of the people of Minnesota to bring into that state, for purposes of sale, sound and healthy meat, wherever such meat may have come into existence. But there is a consideration arising out of the suggestion just alluded to which militates somewhat against the theory that the statute in question is a legitimate exertion of the police powers of the state for the protection of the public health. If every hotel keeper, railroad, or mining corporation, or contractor in Minnesota furnishing subsistence to large numbers of persons, and every private family in that state that is so disposed, can, without violating the statute, bring into the state from other states, and use for their own purposes, fresh beef, veal, mutton, lamb, and pork taken from animals slaughtered outside of Minnesota which may not have been inspected at all, or not within 24 hours before being slaughtered, what becomes of the argument, pressed with so much earnestness, that the health of the people of that state requires that they be protected against the use of meats from animals not inspected in Minnesota within 24 hours before being slaughtered? If the statute, while permitting the sale of meats from animals slaughtered, inspected, and 'certified' in that state, had expressly forbidden the introduction from other states, and their sale in Minnesota, of all fresh meats, of every kind, without making any distinction between those that were from animals inspected on the hoof, and those that were not so inspected, its unconstitutionality could not have been doubted. And yet it is so framed that this precise result is attained as to all sales in Minnesota, for human food, of meats from animals slaughtered in other states.

"In the opinion of this court, the statute in question, so far as its provisions require, as a condition of sales in Minnesota, of fresh beef, veal, mutton, lamb, or pork, for human food, that the animals from which such meats are taken shall have been inspected in Minnesota before being slaughtered, is in violation of the constitution of the United States, and void."

If the city of El Paso had passed an ordinance requiring the makers of ice to ship the water which they intended to use in the ice to El Paso for inspection and then take it back to their plant and make the ice, the situation might be parallel to that in the Barber Case. But nothing in the ordinance suggests the least comparison to the Minnesota statute.

On the other hand, in the Adams Case, Wisconsin law prohibited interstate as well as intrastate commerce, as does the El Paso ordinance.

There, as here, the petitioner claimed that the most the city could do was to require the milk to be pure and wholesome, but the Supreme Court said the city had the right to require an injection into those cows outside the city as a measure of assurance of its purity, just as here the city requires the injection of heat to the water to assure its purity.

There is nothing in the record to indicate that petitioners cannot buy all the distilled water ice they need to supply their demands or that they would have to pay more for it.

They simply demand that they be permitted to bring into the city of El Paso ice manufactured in Juarez, where no periodic inspection of the water supply is made, which the health officer indicates is necessary in saying that at times colon bacteria shows up in the El Paso water supply and has to be treated. The fact that the water in one well in Juarez was pure when it was once tested does not give El Paso any satisfactory assurance that it will remain so or that other wells in Juarez or elsewhere are pure or will remain so. The city is entitled to have the assurance of its purity by the rea-

sonable precaution of distillation. Mr. Justice Higgins correctly so held in his dissenting opinion.

We think the ordinance is valid, and recommend that the judgments of the trial court and Court of Civil Appeals be reversed and judgment be here rendered in favor of plaintiffs in error.

CURETON, Chief Justice.

The judgments of the district court and Court of Civil Appeals are both reversed, and judgment here rendered for the plaintiff in error.