## MILLER v. WILLIAMS.
### No. 2393.

District Court, D. Maryland.
Oct. 7, 1935.

J. Purdon Wright and Samuel Carliner, both of Baltimore, Md., for plaintiff.

Paul F. Due, Asst. City Sol., of Baltimore, Md., for defendant.

CHESNUT, District Judge.

This case involves the validity of a *regulation of* the Health Commissioner of Baltimore City which, in effect, prohibits the sale or use of cream for the *manufacture of ice cream* in Baltimore City when the cream is produced from dairies situated outside of a zone which is limited by a distance of fifty miles from Baltimore City, except in a so-called "emergency," that is, when there is a shortage in quantity of the supply of local cream as compared with the consumptive demand therefor. The regulation approved May 28, 1931, and still effective, is No. 71 and reads as follows:

"Emergency Shipments. Emergency Permits. Dairy plants which lie outside of the regular Baltimore inspection area (as defined in Paragraph No. 2) and which comply with the Regulations of the Baltimore City Health Department concerning the Control of Milk and Milk Products handled in Dairy Plants, and with such additional rules or regulations as may hereafter be prescribed or established by the Commissioner of Health, may be granted Emergency Dairy Plant Permits. Such permitees may ship to Baltimore only when there is insufficient cream or milk products available within the before mentioned inspection area which has been produced and handled in compliance with all regulations and under the immediate inspection supervision of the Baltimore City Health Department."

Paragraph No. 2 above parenthetically referred to reads as follows:

"Dairy Farm Permits and Dairy Plant Permits to ship milk and milk products to this city will be issued only for those farms and plants that are located within the inspection area of Baltimore and at a distance not greater than 50 miles from this city."

In sections 72 and 73 the provision is made that application for emergency dairy plant permits must be accompanied by a fee of $10; and the Commissioner of Health or his representative shall inspect the conditions in handling and controlling the sanitary production and if found approvable the permit will be issued provided, however, that the traveling expenses and subsistence of the inspectors shall be paid by the applicant; such inspections to be made at intervals at least three times annually. Section 74 provides that the Commissioner of Health may refuse to inspect for emergency permits when in his judgment the plant is too remote or practically inaccessible from Baltimore or where such circumstances of production or handling exist as to probably preclude compliance with regulations of the Health Department by the applicant, or where the Department has not sufficient personnel to maintain an effective sanitary control, or for any other similar reason not expressly defined. Section 77 provides that emergency permitees shall operate and maintain their plants in compliance with the regulations of the Health Department; and all milk shall be from cattle which have been regularly tuberculin tested at least once a year or are officially accredited and regarded as tuberculin tested. Section 79 requires the dairy *plant* to maintain dairy *farm* inspection and laboratory control of type approved by the Baltimore Health Department and keep the records thereof on file for inspection. Section 81 provides that emergency cream products may be shipped only in sealed cars containing no other product and must be consigned only to local plants which are licensed to receive emergency milk products and may not be consigned to more than one receiver in Baltimore. And there are other detailed provisions for the inspection, operation and shipment of such milk or cream, including pasteurization.

Persons in Baltimore City engaged in handling such emergency cream by the sale thereof or the use for manufacture into ice cream or other products must also obtain appropriate permits therefor and become subject to the regulations.

The plaintiff's bill alleges that he is a citizen of Pennsylvania with principal place of business in Philadelphia and with a branch office in Baltimore, and has been engaged for some years in the shipment in interstate commerce of dairy products, including cream, from Philadelphia and western points to various places in Maryland, including Baltimore, and also to Washington and points in Virginia; he holds a permit for handling emergency cream in Baltimore, and he has for some years past been shipping into Baltimore cream from the dairy plants of the Hershey Creamery Company of Chambersburg, Pennsylvania, and the Galloway-West Company of Fond du Lac, Wisconsin, and the Dry Milk Company of Columbus, Wisconsin, to all of which companies emergency permits have been issued by the Commissioner of Health of Baltimore City, after inspection by the Department, the expenses of which have been paid, and the cream on arrival in Baltimore has been from time to time sampled and inspected without any condemnations or rejections for a period of ten years. The testimony in general establishes these facts except as to the plaintiff's local license, to be hereafter mentioned. It is further alleged, and the proof shows, that on or about September 6, 1935, the Baltimore City Health Commissioner notified the plaintiff and one of its principal customers that they would no longer be permitted to sell or use cream (for ice cream) produced outside of the 50 mile area except in cases where there is local shortage of cream. Foreign cream for use in other manufactured foods, such as candy, or for resale outside of Baltimore, is not supervised by the Health Commissioner.

The plaintiff submits the contention that this action of the Baltimore City Health Commissioner and the regulation on which it is based, constitute an unreasonable and invalid interference with the plaintiff's business and an unconstitutional interference with freedom of interstate commerce. An injunction is asked against the enforcement of the regulation.

The substance of the defendant's answer justifies his action and maintains the validity of the regulation. Reference is made to the ordinance of Baltimore City, Art. 16, §§ 52 to 81 (which it is admitted was duly passed under the police power granted by the Legislature to Baltimore City, and has been sustained by the Maryland Court of Appeals, Creaghan v. Baltimore, 132 Md. 442, 104 A. 180), regulating the sale and distribution and use of milk and cream in Baltimore City (Baltimore City Code, 1927). Section 52 provides that persons dealing in milk and cream in Baltimore City must obtain permits from the Health Commissioner. Section 55 provides:

"The Commissioner of Health shall have power to adopt such regulations as he may deem proper and necessary to insure all milk and cream intended for consumption in Baltimore City being produced, transported, stored, kept, distributed, retailed and delivered under conditions rendering them suitable for consumption as human food; and to compel perfect hygienic and sanitary conditions of all cow stables, creameries and dairies from which milk and cream so intended for consumption in Baltimore City are produced; such regulations not to be inconsistent with existing laws or ordinances, and copies of the same to be printed and kept for free distribution to the public; and said Commissioner of Health shall have power to prohibit the sale within the corporate limits of Baltimore City of Milk or cream produced, transported, stored, kept, distributed, retailed or delivered contrary to such regulations, whether said milk or cream be produced within or outside the corporate limits of the City of Baltimore; and to the end that said regulations may be enforced in the case of milk or cream produced outside the corporate limits of the City of Baltimore, but intended for consumption therein, said Commissioner of Health may require such of the city milk inspectors as he may designate for the purpose to make inspection at such intervals and times as he may deem expedient of all dairy farms, stables and other places outside the City of Baltimore from which milk or cream are shipped for consumption in Baltimore City."

It will be noted that the provision with regard to the 50 mile area is a *regulation* made by the Health Commission-

er under the assumed authority of the Ordinance. It is not contained in the Ordinance itself and is, of course, not a statute of the State of Maryland, and counsel agree that no Maryland statute affects the case. The reason for the adoption of this regulation is interestingly told in the testimony of Dr. Huntington Williams, the Health Commissioner, of Baltimore City. So far as is known, no other city or district in the United States has a similar regulation affecting its milk and cream supply. In this respect the regulation is said, from the scientific and sanitary aspect, to be a very distinct advance in milk and cream sanitation over the systems prevailing in other places. The proximate cause of the regulation is traced to the early advanced development of Public Hygiene by Dr. William H. Welch, who recently died after a most illustrious career as an eminent pathologist and expert in public hygiene. Largely due to his instruction and influence Baltimore City early gave very careful attention to the regulation of its milk supply. From time to time the ordinances and regulations of the Health Department have been changed and modified in order to insure as nearly as possible ideal sanitation with respect to milk and cream. The basic reason for the regulation as explained by Dr. Williams and his assistant, Mr. Lescure, is that it is not practicable or reasonably possible to effectively inspect and supervise the dairy production of milk at a greater distance than 50 miles from Baltimore; because production of an ideal milk supply is dependent very largely upon the education of the dairy farmer as to what is required for perfect sanitation, and very frequent and efficient supervision of the actual production in the dairy. There are more than 4,000 dairy farms within the 50 mile limit from Baltimore and the number of available inspectors is, as a matter of reasonable expense, necessarily limited. With regard to distantly located dairy plants, for instance those in Wisconsin, it is said to be impossible to make such frequent inspections and to carry on such educational work as is possible within a limited distance from Baltimore City. Nevertheless the first and primary duty of a local Health Department is to insure a supply of milk and cream adequate in amount for the local consumptive demand; and secondarily only, the best possible sanitary product. Therefore, it is thought necessary to provide that the regular and primary source of milk supply for Baltimore shall be that within the closely inspected area and resort should be had to cream produced outside this limited 50 mile area only when there is a greater consumptive demand than can be met by the local supply. This seasonal or, occasional shortage is therefore called emergency milk or cream; and the regulations are designed to carry out this objective.

In the actual practice under the regulation special conditions from time to time have required a very liberal, if not literally unauthorized, application of the regulation. This is due to peculiar local conditions. Ninety per cent. of all the milk and cream produced within the 50 mile zone is controlled as to its sale and distribution by an association for some years heretofore known as the Maryland State Dairymen's Association, now reorganized under the name of the Maryland Co-Operative Milk Producers, Inc. Prior to a few months ago the business policy of the former Association at times resulted in its refusal to sell cream to the plaintiff and to some of the plaintiff's customers, ice cream manufacturers, at wholesale prices which would enable them to conduct their business in competition with other customers of the Dairymen's Association, and when these conditions prevailed the Health Commissioner interpreted the regulation as permitting him to authorize the plaintiff, and one at least of his large customers, to bring into Baltimore and use for ice cream manufacture so-called "foreign" cream. That is to say, the Commissioner interpreted the provision in the regulation with regard to shortage of available supply not literally in terms of an actual physical shortage of cream sufficient for local demands, but in terms of the practical unavailability of the local cream to the plaintiff and his customer at reasonable commercial prices. It is said that this ruling found its principal illustration in the permission given for a year or two in the past and prior to September 5th to the Bettar Ice Cream Company of Baltimore to use the foreign cream brought in and sold to it by the plaintiff. Recently upon the reorganization of the Maryland State Dairymen's Association into the Maryland Co-Operative Milk Producers, Inc., the former selling policy is said to have been changed so that now cream at

wholesale prices (based on carload lot prices) is available for purchase to the plaintiff and to the Bettar Ice Cream Company. In consequence of this changed economic condition the Commissioner has now decided, and has so notified the plaintiff, that hereafter the regulation will be interpreted and enforced according to its literal import which precludes the introduction of foreign cream save in those special situations where there is an actual physical shortage of local cream. It is in consequence of this changed policy of the Health Commissioner that the present suit arises.

The important question in the case is as to the reasonableness of the regulation as a police measure in the interests of the public health. The plaintiff does not challenge the validity of the City Ordinance which grants to the Health Commissioner the power to make reasonable regulations to carry out the requirements of the Ordinance as to the inspection of dairy farms, but he does contend that the particular regulation is not a reasonable exercise of the police power. Counsel for both parties agree that there is no adjudicated case as an authoritative precedent for the reasonableness of the regulation. This is not surprising as the regulation is unique to Baltimore.

The plaintiff attacks the regulation as an unconstitutional direct burden on interstate commerce. But before dealing with that specifically, it is to be noted that the regulation is not in terms aimed at the freedom of interstate commerce, because the 50 mile zone extends into a part of Pennsylvania and affects dairies situated both in Maryland and in parts of Pennsylvania and other states, if beyond the 50 mile limit. In the abstract, therefore, the reasonableness of the regulation is subject to attack not only by those engaged in interstate commerce but by citizens of Maryland outside the zone. While there seems to have been no decided case involving a similar regulation, ordinance or statute, there are a few cases which present somewhat similar situations, apart from the special rights based on the freedom of interstate commerce. In Grant v. Leavell, 259 Ky. 267, 82 S.W.(2d) 283, the Court of Appeals of Kentucky held invalid an ordinance of the City of Louisville which prohibited the introduction and sale in that City of milk produced in plants constructed beyond the City limits subsequent to the ordinance. In State v. Minneapolis, 190 Minn. 138, 251 N. W. 121, the Supreme Court of Minnesota held invalid a city ordinance requiring all pasteurized milk sold within the city to be pasteurized in plants located within the city limits; but a similar ordinance was held valid in Witt v. Klimm, 97 Cal. App. 131, 274 P. 1039; and Judge O'Dunne's oral opinion in Eierman v. Dr. Williams, in the Circuit Court No. 2 of Baltimore City, March 12, 1934 (Baltimore Daily Record March 14, 1934) is to the same effect. See, also, Lang's Creamery, Inc., v. Niagara Falls, 251 N. Y. 343, 167 N. E. 464. In Whitney v. Watson, 85 N. H. 238, 157 A. 78, the Court indicated that a local milk board could fix reasonable boundaries for the area within which they were required to make inspection of milk plants.

The regulation here in question is not an absolute prohibition of the introduction of cream produced in dairies outside the zone under all conditions (based on the ground that the Health Commissioner will not undertake to inspect any dairies outside of the zone because not practicable to do so), but it is only a restriction against outside cream operative when there is the so-called emergency due to inadequacy of local supply. The necessary effect is to create a local monopoly for the particular area free from competition from outside sources except when the Health Commissioner deems the local supply inadequate. As the emergency cream is thus permitted to be dealt in and used whenever the local supply is insufficient, it cannot be said that it is excluded on the grounds of health. And the fact is established that the particular foreign cream dealt in by the plaintiff is produced in dairy plants which hold the so-called emergency permits and which have in fact been inspected and may be further inspected as fully as required by the Health Commissioner, at the expense of the dairies or the plaintiff. The testimony shows further that for several years in the past a very considerable quantity of this foreign cream from the three named outside dairies (and also from other outside dairies), has been permitted to be introduced into Baltimore by the Health Commissioner and, although regularly sampled and tested, has seldom, if ever, been condemned as unsanitary. The plant permit of the Hershey Company was for a time suspended or re-

voked because its dairy farm supervision was not satisfactory, but the permit was reinstated about a year ago. The threatened exclusion of the foreign cream in the future, except on the purely emergency basis, is therefore clearly put not upon the ground that it is unwholesome but on the ground that it is unnecessary; and the underlying reason for the rule as stated by the Health Commissioner is not that such outside cream is necessarily deleterious but only that the Health Commissioner feels assured that the local supply is better.

Plaintiff's counsel make some contention to the effect that the regulation is really designed, as it operates in effect, to create a local monopoly which can maintain higher prices. They point to the fact that the local cream sells at a premium of $2.00 a can or 20 cents a gallon over the foreign cream. On the other hand, the Health Commissioner insists that the great majority of local ice cream manufacturers willingly pay this premium for the local supply by reason of their assurance of its better sanitary quality due to more effective supervision. I am entirely satisfied from the testimony that the primary purpose of the Health Commissioner in formulating and enforcing the regulation was to insure a better milk supply and that he was not actuated by the economic motive suggested, although the incidental effect of creating a better market for the local supply is regarded as only a reasonable reward to local producers for their co-operation in highly sanitary milk production.

 In my opinion the regulation is invalid, when attacked as unreasonable by a directly interested party producing milk within the State of Maryland (in the absence of a state statute) outside the zone or from the point of view of being a direct burden upon interstate commerce. From the latter aspect, the applicable principles of constitutional law are now well settled. Freedom of commerce between the states is the rule and not the exception. Under the Constitution it may be regulated by Congress but unless otherwise specifically so regulated, the states may exercise their police power by statute and may authorize their municipal corporations to do so by ordinances, provided the latter are reasonably adapted to the legitimate end of protecting the health, morals and welfare of the community.

But when local regulations under the guise of police power are not reasonably adapted to accomplish these legitimate ends and constitute a direct burden upon interstate commerce, they must fall. 12 C. J. 52, 60, 81. The principle here involved has been very recently applied by the Supreme Court of the United States to interstate shipments of milk in the case of Baldwin, Commissioner, v. Seelig, 294 U. S. 511, 55 S. Ct. 497, 79 L. Ed. 1032. There a statute of New York which required a minimum price to be paid producers of milk within the State and further provided that no milk from other states should be sold in New York unless the same minimum prices were paid to producers in foreign states, was held unconstitutional as applied to interstate shipments of milk from Vermont, when sold in the original package, whether in the cans in which transported or as milk bottled therefrom. Said Mr. Justice Cardozo (294 U. S. 511, pages 521, 522, 55 S. Ct. 497, 499, 79 L. Ed. 1032):

"New York is equally without power to prohibit the introduction within her territory of milk of wholesome quality acquired in Vermont, whether at high prices or at low ones. * * * Such a power, if exerted, will set a barrier to traffic between one state and another as effective as if customs duties, equal to the price differential, had been laid upon the thing transported. Imposts or duties upon commerce with other countries are placed, by an express prohibition of the Constitution, beyond the power of a state, 'except what may be absolutely necessary for executing its inspection Laws.' Constitution, art. 1, § 10, cl. 2; Woodruff v. Parham, 8 Wall. 123, 19 L. Ed. 382. Imposts and duties upon interstate commerce are placed beyond the power of a state, without the mention of an exception, by the provision committing commerce of that order to the power of the Congress. Constitution, Art. 1, § 8, cl. 3. 'It is the established doctrine of this court that a state may not, in any form or under any guise, directly burden the prosecution of interstate business.' * * * Nice distinctions have been made at times between direct and indirect burdens. They are irrelevant when the avowed purpose of the obstruction, as well as its necessary tendency, is to suppress or mitigate the consequences of competition between the states. Such an obstruction is direct by the very terms of the hypothesis. We

are reminded in the opinion below that a chief occasion of the commerce clauses was 'the mutual jealousies and aggressions of the States, taking form in customs barriers and other economic retaliation.' "

■ Milk and cream are not only necessary articles of food but are perfectly lawful subjects of commerce. They may not be excluded from the ordinary currents of trade and commerce whether interstate, or intrastate, except by regulations reasonably designed to protect the health of the community. Whitney v. Watson, 85 N. H. 238, 241, 157 A. 78; Grant v. Leavell, 259 Ky. 267, 82 S.W.(2d) 283, 285; Cofman v. Ousterhous, 40 N. D. 390, 168 N. W. 826, 18 A. L. R. 235. In Baldwin v. Seelig, supra, the price parity required by the New York statute was sought to be enforced against milk on the ground that it encouraged higher sanitary precautions by Vermont producers; but the argument did not prevail against the dominant principle of the freedom of interstate commerce. It would seem clear, therefore, that the local regulation which in effect is based rather on exclusion of competitive conditions than purely sanitary grounds cannot stand when it directly burdens interstate commerce, even though the primary purpose of the Health Commissioner is to insure an ideal sanitary supply for Baltimore.

■ It does not follow, from the holding that the particular regulation is invalid, that the Health Commissioner of Baltimore does not have ample authority to forbid the importation of unwholesome or defective milk or cream. On the contrary, plaintiff's counsel freely admit that the police power of the state authorizes the rejection of foreign milk or cream from other states where the dairies producing it do not submit themselves to the reasonable inspection requirements of the locality into which the milk or cream is shipped. And a reasonable exercise of the police power in the interests of the health of the community is not an undue restriction on the freedom of interstate commerce. This is plainly pointed out by Mr. Justice Cardozo in Baldwin v. Seelig, 294 U. S. 511, 524, 528, 55 S. Ct. 497, 501, 79 L. Ed. 1032, as follows:

"Appropriate certificates may be exacted from farmers in Vermont and elsewhere (Mintz v. Baldwin, 289 U. S. 346, 53 S. Ct. 611, 77 L. Ed. 1245; Reid v. Colorado, 187 U. S. 137, 23 S. Ct. 92, 47 L. Ed. 108); milk may be excluded if necessary safeguards have been omitted; but commerce between the states is burdened unduly when one state regulates by indirection the prices to be paid to producers in another, in the faith that augmentation of prices will lift up the level of economic welfare, and that this will stimulate the observance of sanitary requirements in the preparation of the product."

And

"It is one thing for a state to exact adherence by an importer to fitting standards of sanitation before the products of the farm or factory may be sold in its markets. It is a very different thing to establish a wage scale or a scale of prices for use in other states, and to bar the sale of the products, whether in the original packages or in others, unless the scale has been observed." .

Other federal and state decisions are to the same effect. Korth v. Portland, 123 Or. 180, 261 P. 895, 58 A. L. R. 665; Hill v. Fetherolf, 236 Pa. 70, 84 A. 677; City of El Paso v. Jackson (Tex. Com. App.) 59 S.W.(2d) 822; Noble v. Carlton (D. C. Fla.) 36 F.(2d) 967; Must Hatch Incubator Co., Inc., v. Patterson (D. C. Or.) 32 F.(2d) 714. It is clear, therefore, that the Health Commissioner has the power to refuse admission to foreign milk or cream unless it conforms to all reasonable health inspection laws and the dairies submit to such reasonable inspection as the Health Commissioner, by his representatives, deems necessary, at the expense of the importer. Indeed the local regulations regarding emergency permits so require, and the particular foreign dairy plants whose products the plaintiff sells hold these emergency permits, and have been inspected by the Health Commissioner. They are of course subject to further inspection and to revocation of their permits if they do not comply with all reasonable requirements. Their products have heretofore long been received without rejection both when there has been a shortage in the local supply, and when the Commissioner otherwise deemed it unreasonable to enforce the particular regulation. Their products may not now be excluded because there is at present an adequate local supply. If the principle of this regulation is once es-

tablished as to milk it could seemingly be extended to other food products such as vegetables, fruits and meats, which are likewise subject, although perhaps in less stringent degree, to food inspection and exclusion laws, but only when reasonable. As to meats, see Minnesota v. Barber, 136 U. S. 313, 10 S. Ct. 862, 34 L. Ed. 455; Brimmer v. Rebman, 138 U. S. 78, 11 S. Ct. 213, 34 L. Ed. 862; as to oleomargarine, Schollenberger v. Pennsylvania, 171 U. S. 1, 18 S. Ct. 757, 43 L. Ed. 49. The result might well be that Baltimore would be made an isolated sanitary area for much of its food supply, although it is certainly not intended to suggest that such an unreasonable extension of the principle is at all likely to be proposed by our very efficient Health Commissioner. The principle, however, is one that runs directly counter to the constitutional freedom of interstate commerce.

■ The defendant interposes certain more or less formal objections to the relief sought by the plaintiff. Thus it is said that the plaintiff is not in a position to ask the aid of the court because he does not hold at the present time the requisite general permits for dealing in cream in Baltimore City. One of the conditions for such a permit is suitable storage facilities for the cream handled. It is, however, shown that the plaintiff has, after proper inspection, heretofore obtained such permits, but they have very recently expired and have not been renewed as required by the local ordinance. Nevertheless it appeared at the hearing that the failure to renew them was merely an inadvertence, and it seems to be admitted that they will be renewed upon proper request.

■ A more substantial objection is that the particular dairy plants outside of the 50 mile area, whose product the plaintiff desires to import, do not themselves hold unlimited permits, and it is said that as these dairies have not themselves applied for these permits, the plaintiff has no standing to handle in Baltimore cream produced from their plants. The substantial answer to this contention seems to me to lie in the fact that the particular dairy plants do hold the *emergency* permits which, under the regulations have been issued to them only after original inspection with satisfactory results and they are, under the terms of the emergency permits, in substance required to submit to the same inspection which is required of dairy plants within the limited area. Their failure to apply for unlimited permits is doubtless explainable by the consideration that under the challenged regulation no unlimited permit would be issued to them. If, under amended and reasonable regulations, a different form of permit is needed by them, they will of course be obliged to apply therefor.

■ It is urged by defendant's counsel that to grant the relief sought by the plaintiff would enable him to import cream from unlicensed and uninspected dairies outside the limited area even though such dairies had not themselves applied for the requisite permits and voluntarily subjected their plants to such supervision and inspection as the Health Commissioner may validly require. But from what has already been said it will sufficiently appear that the plaintiff is not seeking any such broad relief and would not be entitled thereto if he did. The so-called foreign cream is not entitled to any preferential status over the local cream. The Health Commissioner may validly refuse permission to import and sell and use it in Baltimore City unless it conforms to the same reasonably required standards to which the local cream is subjected. But if it is wholesome and not injurious to health and otherwise complies with reasonable requirements of the Health Commissioner, it may not be excluded under the regulation merely because there is an adequate local supply.

■ The real objection of the Health Department to the foreign cream is based on the alleged impracticability of adequate and effective supervision by its own representatives of the dairy farms which produce the milk supply from remotely situated foreign dairy plants. This of itself is not a sufficient basis for excluding the cream although very probably it would support regulations of a somewhat different nature than those applicable to the local supply which would afford every reasonable assurance to the Health Commissioner for the protection of the health of the community. Thus in lieu of personal inspection by representatives of the Health Commissioner of Baltimore City, very probably certificates could be required from appropriate officials of other states from which the cream is imported. The requirements as to the con-

tents of such certificates and the general sufficiency thereof are matters which very largely could be properly entrusted to the discretion of the local Health Commissioner. The Health Commissioner here is striving for an ideal which abstractly is highly commendable. It is said the Baltimore idea in this respect is receiving very favorable consideration in other places. It is entirely possible that gradually higher and higher standards will be set and maintained in the different milk producing centers. But until such conditions generally prevail under which the Health Commissioner here would feel amply justified in accepting certificates of other states' officials without personal inspection, he can still control the situation in the interests of the health of Baltimore by making such inspections of foreign dairy plants and farms by his representatives, at the expense of these plants, as may be reasonably required by general regulations applicable to such foreign plants without discrimination against them in favor of the local plants. If the product of such foreign dairies does not conform to reasonable local requirements the milk can of course be excluded on that ground. In short, the police power of the State and its municipal sub-divisions can be exerted to any extent necessary to insure the health of the community against impure or unsanitary foreign cream, but it may not be exerted as a barrier against all foreign cream, even though not deleterious to health, on the mere ground that the local supply is adequate.

The case does not in any way imply the necessity or obligation of the Health Commissioner to make inspection of dairy plants or farms situated so far from Baltimore that it is not reasonable or practicable to do so in view of the limited personnel of his Department. It is optional with him, within the limitation of his facilities, whether to make such foreign inspections or not. But if he finds it impracticable or inadvisable to do so, then some other form of requirement reasonably adequate to the occasion must be adopted, sufficient to protect the local health but not to constitute an impassable barrier for interstate commerce.

In my opinion, therefore, the plaintiff is entitled to an injunction to restrain the enforcement of the particular regulation provided, however, he and the dairies whose products he imports into' Baltimore, otherwise comply with the provisions of the ordinance and other valid regulations. That is to say, the particular regulation is held invalid but other provisions of the ordinance and regulations not herein challenged, are still applicable, and are now, or can by further regulation be made adequate to protect the local health.

Counsel are agreed that the nature of this case is not such as to require a statutory three-judge federal court in accordance with section 380 of Title 28, of the United States Code (28 USCA § 380), because what is here sought to be enjoined is not a state statute and indeed not even a city ordinance but only a regulation of the Health Commissioner. Ex parte Collins, 277 U. S. 565, 568, 48 S. Ct. 585, 72 L. Ed. 990; Ex parte The Public National Bank of New York, 278 U. S. 101, 49 S. Ct. 43, 73 L. Ed. 202. And the bill in the case does not pray for an interlocutory injunction. The case has been heard and decided on final hearing only. Stratton v. St. Louis Southwestern R. Co., 282 U. S. 10, 51 S. Ct. 8, 75 L. Ed. 135; Smith v. Wilson, 273 U. S. 388, 47 S. Ct. 385, 71 L. Ed. 699; Public Service Comm. v. Wisconsin Tel. Co., 289 U. S. 67, 70, 53 S. Ct. 514, 77 L. Ed. 1036.

In view of the nature of the case, I assume that the findings of fact and conclusions of law as above set forth in this opinion will constitute a sufficient compliance with Equity Rule 70½ (28 USCA following section 723). But if counsel desire more specific findings, they may submit them for consideration.