Otto Milk Company, Appellant, *v.* Rose.

Argued March 23, 1953. Before Stern, C. J., Stearne, Jones, Chidsey, Musmanno and Arnold, JJ.

*Frank P. Barnhart* and *William S. Livengood, Jr.,* with them *Livengood & Nissley,* for appellant.

*Morton Meyers,* Special Counsel, with him *Elvin Teitelbaum,* City Solicitor, and *Yost & Meyers,* for appellees.

OPINION BY MR. CHIEF JUSTICE HORACE STERN, October 5, 1953:

This is an action of mandamus to compel the City of Johnstown by its officers and agents to issue to plaintiff, Otto Milk Company, a permit to sell milk within the city. The case was tried by agreement before the court without a jury as a result of which the court below entered judgment for defendants. From that judgment plaintiff appeals.

Plaintiff's complaint averred that it is a Pennsylvania corporation with its principal place of business in Pittsburgh, that it is engaged in the sale and distribution of milk wholesale in paper containers, that it is duly licensed by the Pennsylvania Milk Control Commission and the Federal Department of Agriculture, that it has passed all inspection tests as to sanitation in its plants and sources of supply by the Commonwealth of Pennsylvania, the Federal Government, the City of Pittsburgh, and various third class cities and boroughs in southwestern Pennsylvania, and that all these cities and boroughs have granted it the permits it applied for.

On September 1, 1949, it made application for a permit to sell pasteurized milk in the City of Johns-

town pursuant to an ordinance of that city which provided that in the case of the sale of milk delivered raw to the consumer a permit should not issue until after an examination of the sanitary condition not only of the place where the milk was to be sold and handled but also of the dairy farm where it was produced, whereas, in the case of milk delivered pasteurized to the consumer, an examination was required of the sanitary condition only of the place where the milk was to be sold, received or handled after delivery from the dairy farm. Notwithstanding repeated requests for action the city delayed issuing a permit, and, on April 4, 1950, it enacted an ordinance, to become effective April 14, 1950, which provided that a permit should not issue, even in the case of milk delivered pasteurized, until an examination had been made of the dairy farm where the milk was produced, of the receiving station or plant where it was received, of the plant where it was pasteurized and bottled, and of every place where it was handled. Meanwhile, on April 12, 1950, plaintiff had begun the present action in mandamus to compel the issuance of a permit.

The City of Johnstown defended on the ground that plaintiff obtains its milk from nearly 800 farms in southwestern Pennsylvania and Ohio, some of them as far distant from Johnstown as 200 miles; that it would be administratively impossible or impractical for the city's health officer or milk inspector to examine all such farms and to examine the receiving stations and the plants where the milk was pasteurized; that the cost of such inspection would be a burden on the taxpayers, probably requiring the employment of two more inspectors at a possible cost of $10,000 a year; and that the present supply of milk in Johnstown was adequate.

Neither in the pleadings nor in the voluminous testimony taken at the hearing of the case did defendants

claim that plaintiff's milk was other than perfectly pure and wholesome, or that it failed to comply in every respect with all proper health rules and regulations. They merely, in effect, say to plaintiff: "It is inconvenient and expensive for us to examine the sources of supply of your milk and therefore we will not allow it to be sold or distributed within our community;—it is just as if we *had* inspected it and found it bad."

It may be observed at the outset that, in view of the admitted facts that plaintiff has been for 25 years in the business of the wholesale distribution of milk; that, as previously stated, it is duly licensed by the Federal Department of Agriculture and by the Pennsylvania Milk Control Commission; that it has passed inspection tests by the Commonwealth, by the Federal Government, by the City of Pittsburgh, by nine other third class cities and seven boroughs in the Commonwealth; and that apparently no authority, national, state or local, other than the City of Johnstown, has ever rejected its application for a permit to sell and distribute its product; and in view further of the peculiar circumstance that the city kept delaying the issuance of a permit for seven months until it enacted an ordinance requiring the inspection of plaintiff's dairy farms;—in view of these facts one cannot but wonder why the City of Johnstown, unlike all the other governmental authorities referred to, is attempting to prevent plaintiff from bringing its milk into that city's market.

This case raises a grave constitutional question. It is self-evident that the right of property includes not only that of owning and possessing it, but also of selling and transferring it to others. No one would contend that any State or municipality would have the constitutional right to deny to a merchant the right

to sell, within its jurisdiction, any ordinary items of personal property, wares or merchandise not requiring supervision under the police power. The only limitation to that right as far as milk or other articles of food are concerned is that regulations to insure the purity and wholesomeness of the product may be adopted as a condition to the granting of permission for its sale or distribution. Indeed there can be no question but that, under the provision of section 18 of the Act of July 2, 1935, P. L. 589, the City of Johnstown is authorized to enact such regulations, even though they may be additional to, and more rigid than, those imposed by the federal or State authorities. But such regulations must be *reasonable* and not arbitrary and *absolutely prohibitive*. If the City of Johnstown were to inspect plaintiff's milk, and also, if it should so desire, the places of supply from which it was obtained, and if, as a result of such inspection, the city were, in good faith, to reject plaintiff's application for a permit, plaintiff undoubtedly would be obliged to submit to that decision. But such is not the situation here under review. The City of Johnstown refuses to make any inspection whatever, but nevertheless, in effect, condemns plaintiff's product, much like a court condemning a defendant without a hearing. It is obvious that if such an attitude were to be judicially sanctioned as being legally and constitutionally permissible every other municipality in the Commonwealth, as well as the Commonwealth itself, could adopt it likewise, with the result that plaintiff could be refused the right to sell its milk, although a perfectly proper object of commerce, anywhere within the entire State. Can a lawful vendor of a lawful product be legally brushed off in that manner?

Contentions similar to those offered by the City of Johnstown have been made in other jurisdictions where

the question which is here involved has arisen. But there does not seem to be any case anywhere—certainly none is cited in the city's brief—in which such claims were upheld. On the contrary, in every one of the reported cases the court declined to adopt the views thus urged by the municipality which had refused a permit on such grounds.

In *Sheffield Farms Co. Inc. v. Seaman*, 114 N.J.L. 455, 177 A. 372, the Health Department of the City of Perth Amboy would not grant the complainant a permit to sell and distribute its milk and milk products in that city. Complainant obtained its milk from hundreds of dairymen in New York, in Pennsylvania, and in New Jersey. The city in that case offered exactly the same excuses as in the present one. The Supreme Court of New Jersey said. (p. 463, A. p. 375): "Respondents concede that they have no knowledge respecting the quality of prosecutor's milk and milk products, or the sanitary condition under which its milk is produced, handled or marketed. It clearly could not, therefore, form a judgment of refusal to grant the permit on unknown or undetermined facts. Nor does the mere lack of funds to investigate the facts justify the refusal. The legislature has provided for such a contingency.[1] . . . It will serve no useful purpose to answer or further discuss the purported reason argued upon which the refusal is sought to be justified. Suffice it to say that the meager facts . . . lead us to the conclusion that they are without substance. They are excuses rather than legal reasons. The city just took the position that it had enough milk dealers and that it had the situation 'well in hand.' Such a position is unreasonable; it is arbitrary, capricious and discrimi-

---

[1] The budgetary appropriation for the Health Department of the city, however, was not sufficient to carry out an inspection of all the sources of the milk supply of the city.

natory. It unlawfully curtails prosecutor's common law right to engage in a lawful business, notwithstanding that it has fully complied with the requirements of the state and city. This the city cannot lawfully do." The refusal to grant the permit was set aside.

In *Urban v. Taylor,* 14 N.J. Misc. 887, 188 A. 232, the Board of Health refused to grant an application of the plaintiff to sell milk in the town of Dover although it did not question the quality of the milk nor the sanitary conditions under which it was produced. The town refused the application "because it would entail too great a financial burden to inspect the source of supply," and also because "the town had already a sufficient supply to satisfy the needs of its inhabitants." It appeared that the plaintiff's milk was inspected and approved by many other municipal Health Boards, including those of Newark, Paterson, Montclair, Perth Amboy, Elizabeth and Union City. The court said (p. 888, A. p. 232) : "It clearly appears that the refusal of the permit was without substance and is not predicated upon any desire to conserve the public health and safety. Mere lack of funds to investigate a source of supply is not sufficient reason to justify the refusal of a permit in view of the circumstance that there seems to have been adequate inspection by state inspectors. Further, because the town already has a sufficient number of milk dealers presents no valid reason for a refusal of the permit requested." The refusal of the permit was set aside by the court.

In *State ex rel. Larson v. City of Minneapolis,* 190 Minn. 138, 251 N.W. 121, a city ordinance requiring that all pasteurized milk sold within the city be pasteurized in plants located within the city limits was held unconstitutional as being unreasonable. The Supreme Court of Minnesota said (pp. 139, 140, N.W. p.

121) : "Under its police power a state or its municipalities may enact statutes and ordinances for the welfare and health of its citizens. Such a statute or ordinance, however, must be reasonable and not arbitrary; must not invade the fundamental liberties of the citizen; must, on the one hand, tend to accomplish the purpose of its adoption; and, on the other, must not go beyond the reasonable demands of the occasion." The court below had stated that " 'It is obvious that adequate inspection is a reasonable precaution. It is obvious that considerations of convenience, efficiency and cost of inspection are proper to be taken into account in determining the question of reasonableness. It is also obvious that there is somewhere a limit of distance beyond which inspection by the city's agents would be too inconvenient, too costly and too likely to be ineffective to be practicable. It seems to me there can be no doubt of the right of the city council to fix a reasonable limit beyond which it will not provide for inspection, and beyond which, for that reason, pasteurization plants will not be licensed. In this ordinance the limit is the boundary line of the municipality.' " Notwithstanding these views of the court below the Supreme Court reversed the latter's refusal to mandamus the City of Minneapolis to grant the requested permit, saying (p. 143, N.W. p. 123) : "If the inspection fee is deemed insufficient, there appears to be no good reason why such insufficiency cannot be remedied in a manner that would impose no unjust hardship on anyone concerned. There is nothing in the record to show what, if any, inconvenience the city may be put to that would justify such a harsh requirement as provided by the ordinance. We are obliged to hold that the ordinance, in so far as it prohibits the sale of pasteurized milk or its products in the city of Minneapolis unless the same shall have been pas-

teurized in a pasteurization plant located within the city limits, violated relator's constitutional rights of property and contract. The restriction contained therein goes 'beyond the reasonable demands of the occasion' and is not adaptable to the end sought."

In *Grant v. Leavell,* 259 Ky. 267, 82 S.W. 2d 283, the Court of Appeals of Kentucky said (p. 270, S.W. p. 285): "Milk, . . . being a legitimate article of commerce, any citizen has the right to handle or trade in the commodity, subject only to the limitation imposed by considerations of public welfare. The right to sell milk, unlike that to sell liquor, which is a privilege, should only be restricted or regulated as the safeguarding of the public health may require." In that case the plaintiff's permit to sell milk in the City of Louisville was refused by the Health Director on the ground that it was contrary to the policy of the city's Health Department to grant permits to distributors of raw milk produced from plants located outside of the city or in the rural districts of the county that were at that time so operating. The court reversed the refusal of the permit.

In *Miller v. Williams,* 12 F. Supp. 236, a regulation of the Health Commissioner of Baltimore prohibited the sale or use of cream for the manufacture of ice cream in Baltimore if the cream was produced from dairies situated more than 50 miles from the city. The court held that, though the primary purpose of such a regulation may have been to insure ideal sanitary milk and cream supply for the city, the regulation was invalid as to a shipper from another state because of its being a burden on interstate commerce. It was contended that the regulation was reasonable because it was not practical, or reasonably possible, effectively to inspect the dairy production of milk at such distances, the number of available inspectors be-

ing, from the standpoint of expense, necessarily limited. The court held that, apart from any question of interstate commerce, the regulation was also unreasonable as to citizens of Maryland outside the 50 mile limit provided in the regulation. The court said (p. 242): "Milk and cream are not only necessary articles of food but are perfectly lawful subjects of commerce. They may not be excluded from the ordinary currents of trade and commerce whether interstate, or intrastate, except by regulations reasonably designed to protect the health of the community." And further (pp. 243, 244): "The real objection of the Health Department to the foreign cream is based on the alleged impracticability of adequate and effective supervision by its own representatives of the dairy farms which produce the milk supply from remotely situated foreign dairy plants. This of itself is not a sufficient basis for excluding the cream although very probably it would support regulations of a somewhat different nature than those applicable to the local supply which would afford every reasonable assurance to the Health Commissioner for the protection of the health of the community. Thus in lieu of personal inspection by representatives of the Health Commissioner of Baltimore City, very probably certificates could be required from appropriate officials of other states from which the cream is imported . . . It is entirely possible that gradually higher and higher standards will be set and maintained in the different milk producing centers. But until such conditions generally prevail under which the Health Commissioner here would feel amply justified in accepting certificates of other states' officials without personal inspection, he can still control the situation in the interests of the health of Baltimore by making such inspections of foreign dairy plants and farms by his representatives, at the expense

of these plants, as may be reasonably required by general regulations applicable to such foreign plants without discrimination against them in favor of the local plants. If the product of such foreign dairies does not conform to reasonable local requirements the milk can of course be excluded on that ground. In short, the police power of the State and its municipal sub-divisions can be exerted to any extent necessary to insure the health of the community against impure or unsanitary foreign cream, but it may not be exerted as a barrier against all foreign cream, even though not deleterious to health, on the mere ground that the local supply is adequate. The case does not in any way imply the necessity or obligation of the Health Commissioner to make inspection of dairy plants or farms situated so far from Baltimore that it is not reasonable or practicable to do so in view of the limited personnel of his Department. It is optional with him, within the limitation of his facilities, whether to make such foreign inspections or not. But if he finds it impracticable or inadvisable to do so, then some other form of requirement reasonably adequate to the occasion must be adopted, sufficient to protect the local health but not to constitute an impassable barrier for interstate commerce." The court therefore held the regulation in question to be invalid.

In *City of Wewoka v. Rose Lawn Dairy*, 202 Okla. 286, 212 P. 2d 1056, the Supreme Court of Oklahoma affirmed the action of the court below in granting a peremptory writ of mandamus against the defendant city to compel it to issue a permit and license to the complainant dairy to sell milk and milk products in the city. In that case the complainant dairy operated a large milk processing plant and its products were obtained from a large territory not only in Oklahoma but also in Missouri and Arkansas. Although its plant

and milk products were inspected by the State Health Department and by cities, state and federal inspectors, they were refused a permit by the health officer of the city to operate in Wewoka on the ground that the city could not inspect the complainant's milk shed or the producers from whom it got its milk. The court held that a provision in an ordinance which enabled the health officer to bar milk and milk products shipped from a great distance unless he could assure himself that they met the provisions of the ordinance was an unreasonable provision. Quoting other authorities to the same effect, the court stated that milk and cream are perfectly lawful subjects of commerce and may not be excluded from the ordinary currents of trade and commerce except by reasonable regulations designed to protect the health of the community. The court pointed out further that under the action taken by the city the complainant was powerless to do anything to enable it to obtain the permit applied for, and that the city's action constituted an impassable barrier to anyone desiring to sell milk within the City of Wewoka regardless of the standard of quality of the product. The court said (p. 290, P. p. 1060): "Lack of means of supervision alone was not a sufficient basis for excluding the milk products of plaintiff or refusing a license . . . Defendants were properly compelled by peremptory writ of mandamus to grant the license." (citing a large number of cases).

Finally, in *Dean Milk Co. v. City of Madison,* 340 U.S. 349, the Supreme Court of the United States, having under consideration an ordinance of a Wisconsin municipality which forbade the sale of milk in the city as pasteurized unless it had been pasteurized and bottled at an approved pasteurization plant within five miles of the center of the city, held that the ordinance was invalid because of its effect on interstate com-

merce. What is of special interest here, however, is that the court said (pp. 354, 355) : "It appears that reasonable and adequate alternatives are available. If the City of Madison prefers to rely upon its own officials for inspection of distant milk sources, such inspection is readily open to it without hardship for it could charge the actual and reasonable cost of such inspection to the importing producers and processors." Moreover, it was pointed out (p. 356) that the local health officer would be justified in relying upon the evaluation by the Public Health Service of enforcement conditions in remote producing areas. In other words, the court concluded that the regulation adopted by the City of Madison was not essential for the protection of local health interests, and therefore that the judgment of the Supreme Court of Wisconsin sustaining the five-mile provision as to pasteurization must be reversed.

It should be entirely clear from these decisions that, while the City of Johnstown in the present case was entitled to make reasonable regulations to insure the purity of milk brought into the city, it could not adopt an ordinance, or measures thereunder, to accomplish that result which at the same time would utterly prevent the sale and distribution in the city of milk that was in fact pure, wholesome, and in every way unobjectionable for human consumption. The question naturally arises,—what are the alternatives the city could adopt in place of establishing such an unjust and invalid embargo? In the first place, it would be reasonable on its part to accept as satisfactory the approval given to appellant's milk by the United States Public Health Service, the State authorities, and those of the City of Pittsburgh and the various third class cities and boroughs that have uniformly acted favorably on appellant's applications. Or, in the second

place, it could conduct reasonably thorough inspections in the nature of "spot checking," which, while sufficiently intensive and extensive to warrant reliance thereon, would not be so onerous as to be either impracticable or unduly expensive. Incidentally, in this connection, it is obvious that *no* inspection, however exhaustive, could be conclusive in its results unless each and every dairy farm were inspected each and every day of its operation, because the cleanliness that might be found there the day of the inspection might be followed by unsanitary practices the following day; in other words, any system of inspection whatever can only be relatively dependable. A third alternative open to the city, as suggested in several of the cases above cited, would be for it to impose upon plaintiff the expense arising from the alleged necessity of employing two additional milk inspectors; only in that event it should similarly impose also upon other milk producers now permitted to operate in the city the cost of inspecting the sources of *their* supply.

The milk inspector of the city testified that he did "survey" (admittedly, not "inspect") about 100 of the farms that supplied appellant and that 20% of them did not measure up to the city's requirements. However, apart from the fact that the city did not advance this as a reason for its refusal to grant plaintiff's application for a permit, the fact that this inspector, according to his testimony, was directed by the head of the Department of Health, "to go out and see as many [of plaintiff's] farms as I possibly could see and just get an overall picture of what I seen. . . . See as many as you can as fast as you can;" and the inspector himself said that he did not know what the purpose of this could be, would seem to cast some doubt upon the motivation and good faith of the inquiry thus entrusted to him.

Defendants argue that the granting of a writ of mandamus is discretionary and not mandatory upon the court. If, however, plaintiff is justified in its contention that the refusal of its application for a permit to sell and distribute its milk in Johnstown was an arbitrary, unjustified and illegal withholding from it of its right so to do, a mandatory order of the court directed to the city officials to issue the permit applied for would clearly be justified under all the authorities.

The ordinance passed by the city after the argument of this appeal providing that no dairy farms should be inspected if located more than fifty miles distant, merely re-asserts the position taken by the city and requires no discussion additional to what has already been said.

The judgment is reversed at the cost of appellees. The record is remanded to the court below with direction to issue a writ of mandamus to compel defendants to grant to plaintiff the permit applied for, either forthwith, or, at the option of defendants, after such reasonable inspections, if any, of plaintiff's dairy farms, receiving stations and pasteurization plants, as defendants may choose to make, and upon their finding therefrom that the production, care and treatment of plaintiff's milk sufficiently comply with the sanitary regulations provided in the city's applicable ordinance and those of the city's Department of Health.